## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| REBECCA SMITH, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, UNITED MEDICAL RESOURCES, UNITED HEALTHCARE SERVICE LLC, and Doe Defendants 1-10,<br><br>Defendants. | No. 22-cv-01658<br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Rebecca Smith ("Plaintiff"), on behalf of herself and all others similarly situated, based upon personal knowledge as to herself and her own acts, and on information and belief as to all other matters formed after an inquiry reasonable under the circumstances, asserts the following in support of her claims against Defendants UnitedHealth Group, Inc. and its wholly-owned subsidiaries ("United" or "Defendants"):

### INTRODUCTION AND SUMMARY OF CLAIMS

1.      United insures and administers health plans, including group health plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). United administers two types of health plans, those which are "fully insured" and those which are "self-funded" ("Plans"). In a "fully insured" Plan, covered healthcare expenses of Plan participants are paid by United out of its own assets under the terms of an insurance contract

purchased by the Plan. In a self-funded Plan, covered healthcare expenses of Plan participants are paid by United from the Plan's assets composed of contributions from the Plan sponsor and payroll contributions from participating employees. On behalf of both types of Plans, United accepts and processes benefit claims, determines if the provider's services are covered by the Plan, and issues payment to health care providers for covered claims on behalf of Plan participants and beneficiaries.

2.      Plaintiff, a participant in a self-funded Plan, brings this action under ERISA to redress United's violations of its fiduciary duties when it engages in a systemic policy and practice of effectuating what are known as "cross-plan offsets." United engages in a cross-plan offset when it unilaterally determines that a benefit payment is due from a Plan to a participant's health care provider, but then withholds all or part of the benefit payment to recover an alleged overpayment United previously made to the provider from a different Plan on behalf of a different participant. Cross-plan offsets directly benefit United to the detriment of self-funded Plans, particularly when self-funded Plan assets are transferred to United to reimburse United for overpayments it retroactively concludes it had made from its fully insured Plans.

3.      United is the big winner of its cross-plan offset policy, as 40-50% of the funds recovered annually are taken from the self-funded Plans and kept by United in order to "offset" overpayments that United caused its fully insured Plans to make; the remaining 50-60% of the offsets are taken by United and then purportedly given to the multitude of self-funded Plans United administers. The amount of money taken from self-funded Plans is not negligible; in 2020, approximately $405 million dollars was recouped by United for

overpayments it asserts it made under its own insurance policies and in 2019, approximately $599 million was recouped by United for overpayments it claims to have made from its own funds.

4.     United not only collects hundreds of millions of dollars from self-funded plans to reimburse itself for mistakes it made in administering claims under the insurance policies it sells to fully insured Plans, but it also collects millions of dollars of unnecessary and arbitrarily determined fees from self-funded plans in connection with this practice by withholding a portion of the funds it has collected through offsets as a "recovery fee" before returning the remaining funds to the self-funded plans that it had deemed to be overpaid. United's self-interested policy of reimbursing itself for overpayments it made administering its fully insured Plans from the assets of the self-funded Plans it controls, and the collection of unreasonable fees from self-funded Plans when recovering their alleged overpayments, not only harms the self-funded Plans whose assets are depleted, but also harms the thousands of participants and beneficiaries who contribute to the cost of their healthcare plans.

5.     Under ERISA, each Plan that United administers is a separate entity akin to a trust that is established for the exclusive purpose of providing healthcare benefits to the participants and beneficiaries of that Plan and defraying the Plan's reasonable administrative expenses. As the claim administrator, United makes coverage and benefit determinations and uses plan assets to effectuate those decisions, including unilaterally deciding when to apply a cross-plan offset, the amount to offset, and which Plan to take it from, and collects fees for doing so. United is therefore a fiduciary to the self-funded Plans

it administers and owes separate fiduciary duties to each such Plan, and to each Plan's participants and beneficiaries.

6.    When acting as a fiduciary, United is required to act "solely in the interest of the participants and beneficiaries" of that Plan and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA, 29 U.S.C §1104(a)(1). United is prohibited from dealing with plan assets in its own interest or for its own account. 29 U.S.C. § 1106(B)(1). It is also prohibited from representing both sides of a transaction between a Plan and another party, including another Plan to which it is a fiduciary. 29 U.S.C. § 1106(B)(2). Under ERISA, United also may not cause a Plan to transfer Plan assets to a party in interest (which includes itself as a fiduciary and party providing services to a Plan) or to pay itself unreasonable compensation. 29 U.S.C. §1106(a)(1)(C) and (D); 29 U.S.C. §1002(14). Finally, in administering claims, United is required to give participants and beneficiaries a full and fair review of their benefit claims in accordance with regulations issued by the Secretary of Labor. 29 U.S.C. § 1133.

7.    Every single one of these provisions are violated by United when it engages in cross-plan offsets and collects fees during the process. United breaches its fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A) when it uses the self-funded Plan's assets for a purpose other than to pay benefits to that Plan's participants and beneficiaries or to defray reasonable expenses of that Plan. It acts on both sides of transactions in violation of 29 U.S.C. §1106(b)(2) when it represents both Plans in a cross-plan offset. When United transfers Plan assets from a self-funded Plan to itself to recover overpayments it caused its

fully insured Plans to make, or to pay itself fees from funds it takes from one self-funded Plan for recovering an overpayment it caused another self-funded Plan to make, it deals with self-funded Plan assets for its own interest or for its own account in violation of 29 U.S.C. §1106(b)(1) and causes the transfer of Plan assets to a party in interest (United) in violation of 29 U.S.C. §1106(a)(1)(C) and (D). While doing so, it ignores the participants' rights to a full and fair review in compliance with the Secretary of Labor's regulations as required by 29 U.S.C. §1133.

8.      Both this Court and the Eighth Circuit have questioned the legality of United's cross-plan offsets in a case challenging United's interpretation of Plan documents to allow the practice. In determining that Plan documents did not authorize cross-plan offsets, this Court stated "[i]t is fairly debatable whether cross-plan offsetting is ever permissible under ERISA," but "[i]t is not fairly, debatable …that the type of cross-plan offsetting challenged in this case – that is, cross plan offsetting engaged in by an administrator who insures some (but not all) of the plans – presents a grave conflict of interest." *Peterson v. UnitedHealth Group, Inc.*, 242 F. Supp. 3d 834, 845 (D. Minn. 2017) ("*Peterson I*"). Similarly, on appeal, the Eighth Circuit noted that although in that case it did not "need to decide here whether cross-plan offsetting necessarily violates ERISA, at the very least it approaches the line of what is permissible" and warned United that "[r]egardless of whether cross-plan offsetting necessarily violates ERISA, it is questionable at the very least." *Peterson v. UnitedHealth Group, Inc.*, 913 F.3d 769, 776, 777 (8th Cir. 2019) ("*Peterson II*").

9.      Significantly, the Secretary of Labor, which is the primary regulator for ERISA Plans and the sole regulator for self-funded ERISA Plans, explicitly concluded in its *amicus* brief in *Peterson II* that cross-plan offsets are inherently illegal under ERISA. In its brief, the Secretary explained that "United's practice of cross-plan offsetting violated United's fiduciary duties under ERISA to act exclusively in the plan participants' interests and to provide participants their plan benefits and was self-dealing prohibited by ERISA," and that "these transactions were structured by United to allow United to profit by recouping its own alleged overpayments from its fully insured plans that are funded through its own accounts with payments from self-funded plans that are funded by plan sponsors and their employees." *Peterson v. UnitedHealth Group*, 2017 WL 3994970, \*\*6, 7 (8th Cir. Sept. 7, 2017) (Brief for the Secretary of Labor as Amicus Curiae in Support of Plaintiffs-Appellees).

10.      Despite these clear warnings that its practice of cross-plan offsetting likely violates ERISA, United continues to engage in the practice with no change other than to incorporate new plan language in many plans that purports to authorize cross-plan offsetting. United continues to automatically include cross-plan offsetting language in the Summary Plan Description ("SPD") it provides to self-funded Plans, requiring the self-funded Plans to take steps to opt-out if the Plan does not want to participate, rather than seeking consent after making a full and understandable disclosure of the process.

11.      United continues to act as "judge, jury, and executioner" when United and a provider dispute whether a claim was overpaid. *See Peterson I*, 242 F. Supp. 3d at 838. It continues to act on behalf of both the Plan providing the offset and the Plan receiving

the offset even though it has been told that this is a "practice that raises obvious concerns under §§ 1104 and 1106." *Id*. at 844. United continues to operate under what this Court described as the "substantial and ongoing conflict of interest" that arises when United simultaneously administers both self-funded and fully insured Plans and "its personal stake in cross-plan offsetting dwarfs than of any self-funded plans" *Id*. It continues to engage in cross-plan offsetting even though another court, faced with the direct question of whether cross-plan offsets violate ERISA, held that "even if [the plans] permit cross-plan offsetting, they cannot circumvent ERISA requirements. . . . [and] cross-plan offsetting is prohibited by ERISA." *See Lutz Surgical Partners PLLC v. Aetna, Inc.,* No. 3:15-cv-02595(BRM) (TJB), 2021 WL 2549343, *18 (D.N.J. June 21, 2021) (holding that Aetna's practice of cross-plan offsetting between self-funded Plans violated Section 406(b)(2) of ERISA, 29 U.S.C. §1106(b)(2), which prohibits a plan's fiduciary from acting on both sides of a transaction involving the plan).

12.    As alleged herein, Plaintiff Smith is a participant in a self-funded ERISA Plan administered by United and has been directly injured as a result of United's use of cross-plan offsets. United processed Plaintiff's claim for benefits and determined that her provider was entitled to receive a set amount of benefit payments from her Plan. However, United did not pay that amount to her provider, but instead withheld a portion of the payment to recover a purported overpayment the provider had received from a fully insured Plan for a different patient. As a result of this cross-plan offset, Jacobs Plan assets meant to pay for Plaintiff's surgery were diverted to United itself for an overpayment it caused to be made by a fully insured Plan. In other words, United – as the administrator of the Jacobs

Plan – took assets from that Plan and put those funds into its own pocket, thereby benefiting itself at the expense of the Plan and Plaintiff. Neither Plaintiff nor her provider consented to the cross-plan offset, and they each disputed the basis for the repayment demands that served as United's justification for its offsets.

13.     As a participant of an ERISA Plan administered by United, Plaintiff is bringing this action against United under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) for appropriate relief under Section 409 of ERISA, 29 U.S.C. § 1132(a)(2), on behalf of all other similarly situated participants and beneficiaries, and their self-funded Plans. ERISA, like the trust law upon which it is based, does not allow a fiduciary to benefit from its self-dealing and disloyalty and requires a self-dealing fiduciary to compensate Plans for any losses and disgorge any unjust enrichment. Accordingly, as permitted under Section 1109 of ERISA, Plaintiff is entitled to the full range of relief against United, including restoration of assets taken by United from self-funded Plans and used to recover overpayments by its fully insured Plans, losses resulting from cross-plan offsetting between self-funded Plans, restoration of profits United made through the use of self-funded Plan assets, along with "such other equitable or remedial relief as the court may deem appropriate, including removal of [United as an ERISA] fiduciary."

## THE PARTIES

### Plaintiff

14.     Plaintiff Smith is a participant in the Jacobs Engineering Group Inc. Medical Plan ("Jacobs Plan") which is a self-funded health benefits plan sponsored by her husband's employer, Jacobs Engineering Group Inc. ("Jacobs"). She and her husband

contribute $145 every two weeks toward the cost of their healthcare coverage under the Plan. Plaintiff resides in Miami, Florida.

**Defendants**

15.     Defendant UnitedHealth Group Inc. is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. It is the largest health insurance company in the United States by all relevant measurements: revenue, members covered, and market share. It issues, administers, and makes benefit determinations for ERISA health care plans around the country through its wholly owned and controlled subsidiaries, including Defendants United HealthCare Services, Inc., United HealthCare Service LLC, United HealthCare Insurance Company, and United Medical Resources. Defendant UnitedHealth Group Inc. operates as, and owns the trademark to, "UnitedHealthcare."

16.     Defendant United HealthCare Services, Inc. is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. It is a wholly owned and controlled subsidiary of Defendant UnitedHealth Group Inc. Through and in combination with its state-level UnitedHealthcare subsidiaries/affiliates/agents, it issues and administers health care plans, including employer group health plans and employer ancillary and specialty benefits plans, which are governed by ERISA.

17.     Defendant United HealthCare Insurance Company is a wholly owned subsidiary of Unimerica, Inc., which is wholly owned and controlled by Defendant United HealthCare Services, Inc. It is the underwriter of insurance provided by United HealthCare Services, Inc. and its state-level subsidiaries/affiliates. It participates in the claims administration process related to United Plans that are insured or administered by such

subsidiaries/affiliates, and issues and administers other United Plans, most of which are governed by ERISA.

18.     Defendant United HealthCare Service LLC is a subsidiary of Defendant United HealthCare Insurance Company and serves as its agent with respect to benefits claim adjudication.

19.     Defendant United Medical Resources ("UMR") is a wholly owned subsidiary of UnitedHealthcare, Inc., a part of UnitedHealth Group. UMR is the country's largest third-party administrator ("TPA") of health benefits.

20.     Doe Defendants 1-10 are yet-to-be-identified subsidiaries or affiliates of UnitedHealth Group Inc. that are involved in some aspect of cross-plan offsetting.

21.     Defendants, other than UnitedHealth Group Inc., do not operate independently and in their own interests, but serve solely to fulfill the purpose, goals, and policies of Defendant UnitedHealth Group Inc.

## JURISDICTION AND VENUE

22.     Plaintiff asserts subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

23.     This Court has personal jurisdiction over Defendants because Defendants' headquarters are located in this District, they transact business in this District, and the ERISA violations alleged herein arose out of administrative policies developed and implemented in this District.

24.     Venue is appropriate in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because United is headquartered in this District and because some or all of the decisions regarding cross-plan offsets took place in this district.

## FACTUAL ALLEGATIONS

**United is a Fiduciary of the Jacobs Plan**

25.     The Jacobs Plan is a self-funded "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1) through which medical benefits are provided to Jacobs' employees and eligible family members as part of employee compensation packages. The Plan pays benefits from the contributions made by Jacobs and premiums from Jacobs employees who elect to participate in the Plan.

26.     United is the Claims Administrator for the Jacobs Plan pursuant to an Administrative Service Agreement. In that role, United (1) performs the initial benefit determination and payment, (2) performs review of the first level of appeals, and (3) performs the second level of appeals.

27.     United is a fiduciary to the Jacobs Plan under 29 U.S.C. § 1002(21)(A)(i) because it exercises authority and control respecting management and disposition of the Jacobs Plan's assets. United opens and maintains a bank account which is under United's sole control, giving it access to the Jacob Plan's assets for the purpose of paying Plan benefits, expenses, fees and other Plan financial obligations. The funds in the account are solely those of the Jacobs Plans and constitute Plan assets consisting of employer contributions set aside for benefit payments and employee contributions. United has sole

authority to issue checks on the Plan account. United can take money from or add money to the account unilaterally. It can transfer money from the account into its general account.

**Authority and Control over Jacobs Plan Assets**

28.     Although the Jacobs Plan and every other Plan that United administers has its own separate bank account, United treats all Plans, including its fully insured Plans, as part of an aggregate source of funding from which it can pay benefits and recoup overpayments. Aggregated payments are drawn on a UnitedHealthcare bank account, and UnitedHealthcare is later reimbursed by the self-funded Plans for payments that it made on their behalf. When United recovers an overpayment it has made with respect to a self-funded Plan, it purportedly credits the Plan's bank account with a refund (less the "recovery fee" it retains to compensate itself for taking the offset).

29.     United's extensive authority and control over Jacobs Plan assets is reflected in the Jacobs Plan Summary Plan Description ("Jacobs Plan SPD"). According to the Jacobs Plan SPD, for all questions surrounding whether heath care services are covered expenses and if so, the amount of eligible expenses to be reimbursed, "Jacobs has delegated to UnitedHealthcare the discretion and authority to decide" whether a treatment or supply is a covered under the Plan and to determine the amount eligible for reimbursement. *Id.*

30.     The Jacobs Plan SPD explains that if United determines that it overpaid a provider, United has discretion and "reserves the right to recover the excess amount from the provider…" *Id.* at Section 10: Coordination of Benefits. It is under this discretionary authority that United takes cross-plan offsets. Upon realizing it made an overpayment to a provider, United allows itself to take "future benefits that are payable in connection with

services provided to persons under other plans for which UnitedHealthcare makes payments, pursuant to a transaction in which the Plan's overpayment recovery rights are assigned to such other plans in exchange for such plans' remittance of the amount of the reallocated payment." *Id.*

**Authority and Control Over Jacobs Plan Management and Administration**

31.     United is also a fiduciary under 29 U.S.C. §§ 1002(21)(A)(i) and (iii) because it exercises discretionary authority or discretionary control over management of the Jacobs Plan and has discretionary authority or discretionary responsibility in the administration of claims for the Jacobs Plan.

32.     United has specifically been given the discretionary authority under the Jacobs Plan to (1) interpret Plan language for covered health services, subject to the terms and conditions of the Plan and any Addendums and/or Amendments thereto, (2) interpret the other terms, conditions, limitations and exclusions of the Plan, including the SPD and any Summary of Material Modifications, and (3) make factual determinations and final and binding determinations related to the Plan and its benefits and the Plan internal appeal procedure. *Id.* at Section 13: Other Important Information. United also has the sole discretion to determine whether healthcare services are medically necessary. *Id.* at Section 14: Glossary.

33.     The terms of the Jacobs Plan SPD give United sole authority over much of the claims handling function, including the review and determination of benefits in accordance with ***United's*** reimbursement policies. *Id.* at Section 13: Other Important Information. United's unilaterally determined reimbursement policies are applied to claims

"[f]ollowing evaluation and validation of certain provider billings (e.g., error, abuse and fraud reviews) …" *Id.*

34.     Although Network providers have contracted with United to accept United's reimbursement policies, non-Network providers have not and the Jacobs Plan SPD warns participants that they "may bill you for any amounts the Plan does not pay, including amounts that are denied because one of UnitedHealthcare's reimbursement policies does not reimburse (in whole or in part) for the service billed." *Id.* United's proprietary reimbursement policies are not provided to Plan participants; if someone wants to read the reimbursement policies for non-Network providers, they are directed to United's home page or to the telephone number on their insurance card. *Id.*

35.     United is also responsible for providing Explanation of Benefits ("EOBs") to participants in the Jacobs Plan. The EOBs are supposed to contain an explanation of the Benefits provided, allowable reimbursement amounts, deductibles and coinsurance, any reductions that are taken from the reimbursable amount, the net amount paid by the Plan, and the reason(s) why a service or supply is not covered under the Plan. *Id.* at Section 14: Glossary. In a different section of the SPD, however, United states that paper copies of the EOB will be sent only if requested by the participant, by either calling the number on the ID card or viewing and printing them online (and directing people to United's home page, rather than the specific landing page where EOB's can be viewed and printed. *Id.* at Section 9: Claims Procedures.

36.     Non-Network Benefits are defined in the Jacobs Plan SPD as how Benefits are paid for Covered Health Services provided by non-Network providers, and refers

participants to Section 5, Plan Highlights, of the SPD to determine whether non-Network Benefits are offered and to Section 3, How the Plan Works, for details about how non-Network Benefits apply. *Id.* According to Section 5 of the Jacobs Plan SPD, non-Network benefits for spine surgery are covered at 50% after the deductible is met. Section 6 of the Jacobs Plan SPD describes covered spine and joint surgeries, which include spine disc surgery and spine fusion surgery. *Id.* at Section 6: Additional Coverage Details.

37.     When claims are denied by United, the SPD for the Jacobs Plan tells participants to call the toll-free number on their ID card prior to requesting a formal appeal. *Id.* at Section 9: Claims Procedures. If the issue remains unresolved, formal procedures for appealing a coverage determination are set forth, with instructions to mail requests for an appeal with certain information and evidentiary support within 180 days to UnitedHealthcare - Appeals P.O. Box 30432 Salt Lake City, Utah 84130-0432. *Id.* United conducts the appeal and if United upholds the denial, a written explanation of the reasons and facts supporting the denial is issued. *Id.* Unsatisfied participants may seek a second appeal within 60 days of receiving the first-level appeal determination. *Id.*

38.     The Jacobs Plan SPD contains strict notification requirements that United must follow. For post-service claims, United must notify participants of their benefits determination within 30 days of submission of a complete claim. *Id.* United must also notify participants of first level and second level appeal decisions within 30 days of receipt of appeal. *Id.*

39.     United has sole, discretionary authority to review claims for accuracy prior to paying them, to review claims post-payment for accuracy, and to seek recovery of

overpayments once identified. There is no communication from United to the Jacobs Plan prior to United pursuing a cross-plan offset, nor a notification to the Jacobs Plan if an offset will *not* be taken by United if an overpayment is identified. If United denies an appeal, in whole or in part, it notifies the participant of the adverse benefit decision and the participant's right to appeal the decision.

**United's Cross-Plan Offsetting System**

40.     Since at least 2007, United has engaged in cross-plan offsetting using self-funded Plan assets held in Plan bank accounts controlled by United. Cross-plan offsets occur when United determines that one of the Plans it is administering (Plan B) is obligated to pay a covered healthcare claim for services rendered by a provider to one of Plan B's participants or beneficiaries. Instead of paying the Plan B benefits to the provider for the Plan B claim, United uses Plan B assets to reimburse an entirely different Plan (Plan A) for Plan A benefit payments made to the provider that United had previously approved and paid but unilaterally determined were overpaid. If the provider does not voluntarily repay the amount demanded for the Plan A overpayment, or if United unilaterally rejects the provider's dispute over the Plan A overpayment demand, United's electronic claims processing system withholds benefits for the next claim for covered services that the provider submits on behalf of a Plan B participant or beneficiary – including benefits indisputably owed by the entirely unrelated, separate Plan B.

41.     United and its vendors collect fees for recovering overpayments from the Jacobs Plan whether through negotiation or by cross-plan offsets; the operative Administrative Services Agreement ("ASO") provides the percentage of the recovery

United takes but gives United discretion to determine how those recoveries are obtained, how much is recovered, or whether to even seek recovery of overpayments. United determines the amount of the fee and unilaterally deducts it from the amount returned to self-funded Plans.

42.    United's practice of cross-plan offsetting was previously challenged successfully in this Court, which found it was unauthorized by the terms of the Plans at issue. In upholding this Court's decision finding that the documents governing the Plans did not authorize cross-plan offsetting, the Eighth Circuit concluded that to interpret Plan language as allowing cross-plan offsetting would be in serious tension with ERISA's fiduciary and prohibited transaction provisions. *Peterson II*, 913 F.3d at 776, 777. That case was voluntarily dismissed in 2019.

43.    Despite being warned by the District Court, the Eighth Circuit, and the DOL that cross-plan offsetting likely violates ERISA, United continues to engage in cross-plan offsetting without addressing the structural conflicts of interest inherent in the system. United now includes difficult-to-comprehend language in Plan documents authorizing it to take cross-plan offsets which is part of its larger "Overpayment Bulk Recovery Process."

44.    The Jacobs Plan SPD informs participants that their Plan can recover overpayments in the following manner:

> If the refund is due from a person or organization other than the Covered Person, the Plan may recover the overpayment by reallocating the overpaid amount to pay, in whole or in part,…(ii) future benefits that are payable in connection with services provided to persons under other plans for which UnitedHealthcare makes payments, pursuant to a transaction in which the Plan's overpayment recovery rights are assigned to such other plans in exchange for such plans' remittance of the amount of the reallocated

17

payment.

Jacobs Plan SPD at Section 9: Coordination of Benefits. This is not only incomprehensible, but it is also located in the section of the SPD related to coordinating benefits with other payors, which has nothing to do with cross-plan offsets.

45.     United confirmed its systemic policy to take cross-plan offsets in an August 2021 notice ("August 2021 Notice") to its self-funded clients in which it purports to provide "information on UnitedHealthcare's Bulk Recovery Process, also referred to as cross-plan                                                                   offsetting." https://www.uhc.com/content/dam/uhcdotcom/en/Legal/PDF/Bulk-Recovery-Process.pdf.

46.     Under its Bulk Recovery Process, United continues to represent both sides of cross-plan offsetting transactions by "recovering" amounts it caused to be overpaid to Plan As from Plan Bs and then "crediting" that amount to Plan As. And it continues to use self-funded Plan B assets to compensate itself for overpayments it made in its fully insured Plan As. United describes a cross-plan offsetting transaction as follows in its August 2021 Notice:

> Once overpayments are identified, UnitedHealthcare starts by offering medical providers who may have received overpayments the opportunity to dispute and/or voluntarily refund the overpayments. If providers choose not to dispute the overpayments or UnitedHealthcare determines that the providers' disputes are not valid, UnitedHealthcare uses the Bulk Recovery Process to collect the receivables due against current or future payments to the overpaid providers under any plan that UnitedHealthcare administers. The recovered amount is then credited to the plan that overpaid. The Bulk Recovery Process allows UnitedHealthcare plans – both self-funded and fully insured – to efficiently recover overpayments made to providers by clearly identifying the claims being paid and the funds being recovered

within a single payment instrument on behalf of all employer groups serviced by United Healthcare.

47.     United gives the following example of its Bulk Recovery Process in the

August 2021 Notice:

> For example, the provider may have $1,000 of receivables in claim payments owed to them and owe $200 in non-refunded overpayments payable to a plan that is not making a claim payment. In this example, UnitedHealthcare will pay the provider $800, with the remaining $200 allocated to overpayments owe by the provider. This satisfied the net payment due to the provider and settles the provider's $200 overpayment debt.

What this means is that the Plan B, *i.e.*, the Plan whose new claim is processed by United,

is charged the full amount owed to the provider on behalf of the insured, in this example,

$1,000, and pays the full amount of $1,000 to United. But United does not pay this full

$1,000 to the provider who is owed that amount for the services that provider offered to

the Plan B member. Instead, the provider is only paid $800, and $200 is "credited" to the

Plan A that purportedly overpaid for a service provided to its Plan A member. In this

example then, United took $200 of Plan B assets and allocated it to Plan A. If Plan A is

fully insured, that means that United keeps the entire $200 for itself. If Plan A is self-

funded, then United will keep a percentage of the $200 for itself as a "recovery fee."

48.     As the August 2021 Notice states, United's self-funded Plan customers "are

automatically included in the Bulk Recovery Process when the Summary Plan Description

(SPD) document includes UnitedHealthcare's required 'Bulk Recovery Plan' language"

and can only "opt out of the Bulk Recovery Process by contacting their UnitedHealthcare

representatives." *Id*. United strongly warns against opting out of the Bulk Recovery

Program, stating that "[I]f a plan elects not to participate in the Bulk Recovery Process, it

can recover overpayments made to providers only when those providers choose to make repayment of by [sic] offsetting the plan's own future payments made to those providers." *Id.*

49.     United downplays the impact of *Peterson II* in its August 2021 Notice by stating that the decision simply requires explicit authorizing language permitting the Bulk Recovery Process in Plan documents and "is limited to certain older UnitedHealthcare plans that were at issue in the litigation," noting that "UnitedHealthcare's template plan language has for years included language expressly authorizing bulk recovery through offsets' and that [t] hose updated plans are unaffected by this ruling." United, however, does not inform its self-funded Plan customers that the DOL considers cross-plan offsetting to be in violation of ERISA and that United itself is far and away the greatest beneficiary of this system – it is acting on both sides of every cross-plan offsetting transaction and benefits financially every time it recovers money for itself from a cross-plan offset (and every time it takes an offset from one self-funded Plan to satisfy an alleged debt in another). Nor does it inform its self-funded Plan customers that this Court and the Eighth Circuit warned that any cross-plan offsetting language in a Plan document would be in serious tension with ERISA's loyalty and prohibited transaction provisions.

50.     United collects substantial fees from self-funded Plans when engaging in cross-plan offsets. When United reduces the billed charges to a lesser amount, it recovers a percentage of "savings," i.e., the difference between the billed charge and the actual amount paid. When United recovers an overpayment to a provider, it also recovers a

percentage of the overpayment recovered, despite the fact that it was United that made the overpayment in the first instance.

**Cross-Plan Offsetting Harms Self-Funded Plans, Participants and Beneficiaries and Benefits United**

51.     United's self-interest in recovering overpayment errors it makes in adjudicating its fully insured plans and collecting fees for doing so infects and distorts the entire claims administration process. United treats fully insured Plan claims and self-funded Plan claims as part of one integrated system. Because United is required to process insured claims in compliance with state prompt payment laws or suffer financial consequences, it is in United's best interest to auto-adjudicate an insured claim quickly even if the initial payment is in error. United uses this same auto-adjudication system for the self-funded Plans it administers even though prompt payment laws do not apply to self-funded Plans regulated by ERISA and United has payment integrity systems it advertises that can correct errors prior to payment. Instead, United processes claims the same for its self-funded clients as it does its insured clients, opting to use its Bulk Recovery System after the fact; this allows United to take a fee for recovering its overpayments, even if they were solely caused by United's own negligence, and to make and save money for itself when doing so. This system results in self-dealing in violation of ERISA by United in three major ways.

52.     First, as United itself admits, the Bulk Recovery System gives United access to a large pool of self-funded Plan assets from which it can recover payments that it purportedly made in error under the insurance policies it sells to fully insured Plans and

which go directly into United's account. In fact, when United first conceived of and initiated cross-plan offsetting in 2007, it touted the fact that cross-plan offsetting would allow United to take money for itself out of the pocket of self-funded Plans. *Peterson I*, 242 F. Supp. 2d at 839. The amount United has taken from self-funded Plans to recover fully insured Plan overpayments is substantial, reported by United as ranging from $405-$599 million per year from 2018 through 2020. This allowed United to recover 91% of the amount it unilaterally determined had been overpaid by fully insured Plans in 2018 and 94% of overpayments to its fully insured Plans in 2019.

53.     Second, the Bulk Recovery System allows United to avoid financial penalties or other liability for wrongful disbursement or mismanagement of self-funded Plan assets. According to its own statistics, United recovered amounts ranging from $755-$881 million per year for self-funded Plans from 2018 through 2020 for errors that it made processing their claims. Despite these significant numbers, United is not nearly as aggressive collecting self-funded Plan overpayments as it is collecting the fully insured Plan overpayments made out of its own assets. According to United's own statistics, it collected only 81% of self-funded Plan overpayments identified and confirmed in 2018 compared to the 91% return rate to insured Plans, and 85% of overpayments for the self-funded Plans compared to 94% recovery for fully insured Plans in 2019.

54.     Third, United collects fees from self-funded Plans through recovery of overpayments made to self-funded Plan providers. When United corrects its initial errors that caused the overpayments to be made by requiring providers to return the payment or by using a cross-plan offset, it charges the self-funded Plan a percentage of the recovery as

a fee which is debited by United from the Plan's bank account by keeping back a percentage of the funds recovered from the self-funded Plan B. Similarly, when it pays providers who allegedly participate in one of its vendor's networks less than the provider bills, it charges Plans a savings fee for whatever is "saved" by the payment reduction. In some cases, the amount "saved" and kept by United as a fee is greater than the amount paid to the provider and is disguised as part of the benefit payment.

55.     While United benefits, self-funded Plans are injured by cross-plan offsetting. Every dollar that is taken out of a self-funded Plan account to reimburse a different Plan is a dollar that is not spent providing benefits to participants and beneficiaries or deferring reasonable expenses of that Plan. Every decision that United makes during a cross-plan offset benefits United and is tainted by self-dealing.

56.     United was warned by this Court, the Eighth Circuit and the DOL that cross-plan offsetting likely violates United's duty of loyalty and ERISA's prohibited transaction provisions, but United did not mention this to its self-funded Plan clients in its August 2021 Notice. Had United informed self-funded Plan clients of the views of DOL, this Court, and the Eighth Circuit, self-funded Plan fiduciaries would have been required to investigate whether United was violating ERISA and to remedy any violations or risk personal liability for any resulting losses under ERISA § 405, 29 U.S.C. § 1105.

57.     United does acknowledge, however, in its August 2021 Notice that its Bulk Recovery Process puts self-funded Plans at risk, as Plan participants may be balance billed and that Plan participants or their provider could sue the Plan for nonpayment:

**Are there any legal risks associated with the Bulk Recovery Process?**
Even with the additional plan language authorizing the Bulk Recovery
Process, there is a risk that a plan participant whose claim payment to an out-
of-network provider was offset may be balance billed by the provider with
the provider taking the position that the satisfaction of his debt to an unrelated
plan through the offset does not constitute valid payment for his services.
Such balance billing could lead to complaints by impacted individuals. Note
that in-network providers are contractually prohibited from member balance
billing.

Another risk is that the provider or the balance-billed participant may sue the
plan for nonpayment, again taking the position that satisfaction of the
provider's debt to an unrelated plan does not constitute valid payment for his
services. We believe any such claims would fail on the merits, and
UnitedHealthcare will assist with any litigation stemming from the plan's
participation in the Bulk Recovery Process. The plan language has provided
expressly authorizing the Bulk Recovery Program has been drafted to
minimize this risk.

58.     In addition to this statement concerning legal risks underlying cross-plan

offsets, United further noted that "[c]ertain out-of-network provider have alleged in

lawsuits that in the absence of . . . an agreement [to repay an alleged overpayment], an

offset amounts to non-payment of currently pending claims," adding that the Eighth Circuit

noted in its January 2019 decision that payment of benefits to such out-of-network

providers through offsets "arguably amounts to failing to pay a benefit owed." United then

reiterated that it would continue to fight to continue with its cross-plan offsetting policy,

stating:

> UnitedHealthcare vigorously disagrees with these providers and maintains
> that out-of-network providers who have failed to contest identified
> overpayments cannot reasonably assert that UnitedHealthcare's cancellation
> of the associated overpayment debts as part of an aggregated payment fails
> to afford the providers' valid consideration. The Eighth Circuit's January
> 2019 decision was limited to determining what kind of plan language is
> required to authorize the Bulk Recovery Process and does not resolve the
> ongoing dispute concerning whether offsets applied to aggregated payments
> constitute valid consideration.

24

59.     There is no doubt that United can easily identify each and every time it takes a cross-plan offset, including which Plan the funds come from and to where there are directed, whether to United's own fully insured Plans or to self-funded Plans. As United explain in the summary of its Bulk Recovery Process program:

> UnitedHealthcare's process provides information to our customers so that they can track the refunds recovered on their behalf. Customers have access to online banking data and are provided with their monthly electronic customer (eCRs), which detail the refund credits, including whether the overpayments are recovered through refunds or bulk recovery. The crediting details associated with overpayment recoveries will be identified to each self-insured plan in the monthly "Detailed Report for Transfer Evaluations" as "Tran Code 0050 Personal Refunds." UnitedHealthcare reconciles each payment, itemizing both claims payments and recovered overpayments for each plan. This ensures that the appropriate bank accounts are credited and debited after the patient liability is assigned and the overpaid claims that were recouped have been adjusted.

Thus, it will be a simple matter for United to identify where all the funds went that were taken through the prohibited transactions in which it engaged with its cross-plan offset policy.

**Cross-Plan Offsets Distorts the Claims Procedure and Deprives Plan Participants of their Benefits and their Right to a Full and Fair Review**

60.     ERISA § 503(1), 29 U.S.C. § 1133(1), requires United, as Plan claims administrator, to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." ERISA § 503(2), 29 U.S.C. § 1133(2), requires that United afford any such participant or beneficiary the opportunity for a "full and fair" review of any benefit denial.

61.      DOL implemented ERISA § 503 by promulgating 29 C.F.R. § 2560.503-1 ("the ERISA Claims Regulation"). The ERISA Claims Regulation requires United to give participants certain information and rights any time it makes "[a] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit." *See* 29 C.F.R. § 2560.503-1(g) (required content of notice) & (m)(4)(1) (definition of "adverse benefit determination" for which notice is required). United's cross-plan offsets are adverse benefit determinations under the ERISA Claims Regulation because each time United takes a cross-plan offset, it makes a "reduction, or . . . failure to provide or make payment in whole or in part" of a claim. 29 C.F.R. § 2560.503-1(m)(4)(i).

62.      The ERISA Claims Regulation also requires that it notify participants who submit post-service claims to be notified of the Plan's adverse benefit determination within a reasonable period of time, but not later than 30 days after receipt of the claim. This period may be extended one time by the Plan for up to 15 days, provided that the Plan administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the claimant, ***prior to the expiration of the initial 30-day period*** of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision. 29 C.F.R. § 2560.503-1(f)(2)(iii)(B).

63.      The history of Plaintiff's benefit claim is evidence that United does not comply with the ERISA Claims Regulation when it processes claims pursuant to its Bulk Recovery Process but instead manipulates the system to provide itself with opportunities to take cross-plan offsets and to collect fees.

**Plaintiff Smith's Spinal Surgery Claim**

64.     Plaintiff Smith received spinal surgery, using the Deuk Laser Disc Repair ("DLDR") procedure, from Dr. Ara Deukmedjian at Sierra Center of Viera ("SCV") on November 10, 2020. SCV submitted a claim to United on behalf of Ms. Smith for $109,360 relating to the surgery. In a Provider Remittance Advice ("PRA") to SCV, dated January 8, 2021, United reported that it only allowed $3,420.36 for the service. After half of that amount was applied to Ms. Smith's coinsurance, the other half, $1,710.18, was paid to SCV. The PRA then reported that the $107,649.82 of the unpaid portion of the bill remained Ms. Smith's responsibility, including her co-insurance and the difference between the billed and allowed amount.

65.     In the PRA, United stated that the reimbursement amount had been determined by Data iSight, a third-party repricing company owned by MultiPlan Inc., a United vendor. United requested in the PRA that SCV contact Data iSight before billing Ms. Smith. SCV subsequently contacted Data iSight and, in an agreement with SCV dated February 12, 2021, Data iSight, as United's agent, agreed to set the allowed amount at $56,390.18, with SCV agreeing to accept this amount as the adjusted price and not to balance bill Ms. Smith for the difference between the original billing amount and this price. Data iSight and United were entitled to recover a savings fee for reducing the claim from $109,360. It is unclear how this amount was decided and why the Jacobs Plan SPD, which informs participants that 50% of non-Network claims for spine surgery will be covered after the annual deductible is met (Jacobs Plan SPD at Section 5: Plan Highlights), resulted in an initial determination that the claim submitted for $109,360 would be first reduced to

$3,420.36 and then negotiated with a third-party vendor to $56,390.18. Both of these determinations were adverse benefits determinations requiring notice to Plaintiff under the ERISA Claims Regulation and requiring it be provided within 30 days of the submission of the claim. ¶¶ 62-63.

66.     United issued a revised PRA dated, April 23, 2021, to reflect the Data iSight agreement. It reported that the billed charge was $109,360.00, that the "adjusted amount," i.e., the discount agreed to by SCV, was $65,567.69, and that the new allowed amount was $56,390.18. Of that amount $12,597.87 was applied to Ms. Smith's co-insurance, which was reflected as her total "patient responsibility." This left a "payment amount" to SCV of $43,792.31. After deducting the $1,710.18 that had been paid when the claim was originally processed, the remaining $42,082.13, was identified in the PRA as the "Total Payable to Provider." The same information was also submitted by United to Ms. Smith in an EOB. Again, these numbers do not match the percentages disclosed in the Jacobs Plan SPD, nor does an EOB sent to a participant more than two months after the agreement with Data iSight was reached comply with the ERISA Claims Regulation or the Jacobs Plan SPD, both of which require notice to be sent within 30 days of the claim submission.

67.     United confirmed that $42,082.13 was "payable" to SCV. However, that was not the amount that SCV actually received. Instead, United only paid SCV $39,458.99, leaving $2,623.14 unpaid. While United misleadingly omitted this amount from what it reported that Ms. Smith owed in the PRA and the EOB, she in fact still owed this amount to SCV since SCV had not actually been paid the full amount it was owed by United for the services it provided to Ms. Smith. This was the amount offset by United and was not

included in the EOB to Plaintiff despite United being required to do so under the Jacobs Plan SPD and the ERISA Claims Regulation.

68.    United did not treat the offset as an "adverse benefit determination" under ERISA and therefore did not offer Plaintiff a right to appeal the offset. Rather, in the EOB it submitted to Plaintiff, it considered the full $42,082.13 to have been paid, ignoring the fact that $2,623.14 had, in fact, not been paid due to the offset.

69.    United explained the discrepancy in the PRA to SCV (although not in the EOB to Ms. Smith, making that EOB incomplete and misleading). The PRA asserted that SCV had been previously overpaid by $6,313.06 for services that SCV had provided to a different patient, "CK," who was covered under a different health benefits plan. CK's United Plan was issued through his employer, Embraer Executive Aircraft. It was a fully insured Plan, meaning that the original benefit paid on behalf of CK, and subsequently recouped through the cross-plan offset detailed herein, was by United, not CK's employer.

70.    The PRA to SCV reported that $3,689.92 had previously been "deducted" (a.k.a. offset) from a different claim submitted by SCV, and that this time the remaining $2,623.14 was being deducted from the amount that United owed to SCV for the services provided to Ms. Smith. Thus, after this amount was deducted from the "payable" amount of $42,282.13, United only paid SCV $39,458.99 for Ms. Smith's claim. This process flies in the face of the promises contained in the Jacobs Plan SPD (*see* ¶¶ 36-39) and the requirements of the ERISA Claims Regulation (*see* ¶¶ 61-63, requiring written notice of all adverse claims determinations to be sent to the participant within specified time frames.).

71.     Because the Jacobs Plan which funds Ms. Smith's healthcare benefits is self-funded and CK's plan (the one that previously had overpaid, according to United) was fully insured, United took $2,623.14 from the Jacobs Plan that was earmarked for payment to SCV, as Ms. Smith's provider, and kept it for itself instead. Although it did not pay Ms. Smith's provider the full amount of Ms. Smith's claim, it did not advise Ms. Smith in her EOB that the entire claim was not being paid to her provider and did not give her an opportunity to appeal the adverse benefit decision as required by 29 C.F.R. § 2560.503-1 and the terms of the Jacobs Plan SPD.

72.     Ms. Smith and the Jacobs Plan were injured when United agreed that her claim for DLDR surgery was covered and entitled to reimbursement, but then withheld a portion of the amount owed to her provider for her surgery as part of a cross-plan offset designed to benefit United through its fully insured plan that covered CK.

73.     For the reasons set forth herein, Ms. Smith has suffered Article III injuries as a result of United's flagrant disregard for the Jacobs Plan SPD and failure to follow the ERISA Claims Regulation.

## CLASS ALLEGATIONS

74.     There is nothing unique about the unfortunate way Plaintiff's claim was handled by United; United's mishandling of Plaintiff Smith's claim plays out regularly in United's performance of claims administration. SPD provisions are routinely ignored, and the requirements set forth in the ERISA Claims Regulation are habitually flouted by the largest insurance company in the United States so that it can apply its own proprietary reimbursement policies when and how it wants to in a manner most advantageous to itself,

notwithstanding the fiduciary obligations it owes to plan participants in its role as Claims Administrator.

75.     To address United's ERISA violations resulting from its cross-plan offsets and related fees, Plaintiff brings claims on behalf of a class (the "Class") defined as follows:

> All persons in the United States who were covered under an ERISA self-funded plan administered by United, who had at least one claim processed by United with a benefit amount identified that was due and owing to a non-Network provider whose claims were not paid in full by United because United withheld it and applied some portion of the covered amount toward an alleged overpayment by a different plan.

76.     The proposed Class seeks relief for itself and on behalf of the Class's Plans for losses to the Class's Plans caused by United's cross-plan offsets and fees taken in connection with cross-plan offsets.

77.     **Numerosity**. The proposed Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because there are thousands of persons in the self-funded Plans administered by United, which is the largest insurance companies in the United States and administers claims on behalf of millions of insureds. United issues more than a million repayment demands each year and recoups through offsets and repayments more than $1 billion each year through its Bulk Recovery Process. As such, there are thousands of ERISA insureds who fall within the proposed Class, involving thousands of different ERISA Plans. The number of Class members is so large that joinder of all its members is impracticable.

78.     **Commonality.** This case satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it presents numerous common questions of law and fact which

predominate over any questions affecting individual Class members, including but not limited to: (a) whether United took cross-plan offsets; (b) whether United breached its duty of loyalty under 29 U.S.C. § 1104 to act "solely" in the interest of the Plan B participants and beneficiaries and for the "exclusive purpose" of paying benefits and defraying reasonable expenses of administering Plan Bs by taking cross-plan offsets from self-funded Plans and/or collecting unnecessary fees; (c) whether United engaged in prohibited transactions under 29 U.S.C. § 1106 when it transferred Plan B assets to itself; (d) whether United engaged in prohibited transactions in violation of 29 U.S.C. § 1106 by acting on behalf of Plan Bs and Plan As whose interests were adverse when engaging in cross-plan offsets and (e) whether United violates 29 C.F.R. § 2560.503-1 (the ERISA Claims Regulation) by failing to disclose required information, providing misleading information, and otherwise administering claims in this manner.

79.    **Adequacy.** The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied because Plaintiff will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel, Zuckerman Spaeder, Berger Montague, and Lockridge Grindal Nauen, P.L.L.P, who are competent and experienced in class action litigation and the prosecution of ERISA claims, and have no interests antagonistic to or in conflict with those of the Class.

80.    The Class satisfied the requirements for certification under Rule 23(b).

81.    **Rule 23(b)(1).** This ERISA action for breach of fiduciary duty is a classic 23(b)(1) class action. In the absence of the current dispute being resolved in a class action, there is a risk that inconsistent or varying adjudications with respect to individual actions

challenging cross-plan offsets would establish incompatible standards of conduct for United with regard to its Bulk Recovery Process.

82.     **Rule 23(b)(2)**. United has acted on grounds that apply generally to the Class, as United has engaged in a uniform practice of taking cross-plan offsets to recoup alleged overpayments without regard to which Plan any Class member is in.

83.     In its role as a claim administrator and ERISA fiduciary for the self-funded Plans at issue, United maintains records of when and how it receives, processes, and pays claims, and, as part of that, has the records to identify each and every time it has taken a cross-plan offset and the amounts that it has taken from each Class member. Furthermore, the August 2021 Notice of United's Bulk Recovery Process states that "[t]he crediting details associated with overpayment recoveries will be identified to each self-insured plan in the monthly 'Detailed Report for Transfer Evaluations' as 'Tran Code 0050 Personal Refunds.' UnitedHealthcare reconciles each payment, itemizing both claims payments and recovered overpayments for each plan." Accordingly, the members of the Class can be readily and objectively ascertained through use of United's records.

84.     **Rule 23(b)(3).** As an alternative to the putative Class satisfying the requirements of Rule 23(b)(1) and (b)(2), the Class also satisfies the requirements for certification under Rule 23(b)(3). The questions of law or fact concerning United's cross-plan offsetting practices, their legality under ERISA, and the appropriate remedy for the ERISA violations predominate over any questions affecting only individual members, and a class action to address these issues is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CAUSE OF ACTION

### Count I

**Breach of Fiduciary Duty of Loyalty
in Violation of ERISA § 404, 29 U.S.C. §1104(a)**

85.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

86.     At all relevant times, United was a fiduciary of the ERISA Plans it administered under 29 U.S.C. § 1002(21)(A).

87.     As fiduciaries, Defendants have a duty to act "solely in the interest of the participants and beneficiaries" of the Plans they serve and "for the exclusive purpose of: (1) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," in accordance with ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

88.     United breached this duty of loyalty when it used assets of Plaintiff's and the Class's self-funded Plan for the non-Plan purpose of resolving a disputed debt to a different Plan and not providing benefits to Plan participants and beneficiaries.

89.     This breach of the duty of loyalty was exacerbated when United used cross-plan offsets to take the assets of self-funded Plans to recover alleged overpayments made on behalf of United's fully insured Plans, a practice which benefited United at the expense of the self-funded Plans and their participants and beneficiaries. It was further exacerbated when United unilaterally determined the amount and collected fees from self-funded Plans for recouping overpayments it made to providers.

90.     As a direct and proximate cause of the above breach of fiduciary duty, Plaintiff's and the Class's self-funded Plans have lost hundreds of millions of dollars, for which the Defendants are jointly and severally personally liable.

91.     Plaintiff seeks an order under ERISA §§ 409 and 502(a)(2), 29 U.S.C. § 1109 and 1132(a)(2), requiring Defendants to restore all money taken from the self-funded Plans and to disgorge any ill-gotten profits or fees caused by their violations of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and to provide any other relief set forth in the Prayer for Relief or that is just and proper.

## Count II

### Breach of Fiduciary Duty by Engaging
### in Self-Dealing Transactions Prohibited by
### ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1)

92.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

93.     At all relevant times, United was a fiduciary of the ERISA Plans it administered under 29 U.S.C. § 1002(21)(A).

94.     As fiduciaries, Defendants have a duty to avoid "deal[ing] with the assets of the plan in [their] own interest or for [their] own account." ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). United's use of self-funded Plan assets to recoup alleged overpayments by fully insured Plans and to collect fees related to the recoupments constitute a breach of this fiduciary duty and a prohibited transaction, because United takes Plan assets for its own account and in its own interest, instead of paying benefits to participants and beneficiaries.

95.     As the direct and proximate result of the above breach of fiduciary duty and prohibited transaction, self-funded Plans have lost hundreds of millions of dollars, for which Defendants are jointly and severally personally liable.

96.     Under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), Plaintiff seeks an order requiring Defendants to restore all losses to self-funded Plans and to disgorge any ill-gotten profits or fees caused by their violations of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and to provide any other relief set forth in the Prayer for Relief or that is just and proper.

### Count III

**Breach of Fiduciary Duty by Representing
Both Sides of a Transaction Prohibited by
ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2)**

97.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

98.     At all relevant times, United was a fiduciary of the ERISA Plans it administered under 29 U.S.C. § 1002(21)(A).

99.     ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), prohibits a fiduciary from representing both sides of a transaction between a plan and another party whose interests are adverse.

100.    United, acting as a fiduciary to each of the Plans it administers, engages in a prohibited transaction in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), when it diverts one Plan's assets to another Plan to resolve an asserted overpayment because United cannot represent both sides of that transaction.

101.     As the direct and proximate result of the above breach of fiduciary duty and prohibited transaction, self-funded Plans have lost hundreds of millions of dollars, for which Defendants are jointly and severally personally liable.

102.     Under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), Plaintiff seeks an order requiring Defendants to restore all losses to self-funded Plans and to disgorge any ill-gotten profits or fees caused by their violations of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and to provide any other relief set forth in the Prayer for Relief or that is just and proper.

## Count IV

### Breach of Fiduciary Duty By
### Transferring Plan Assets to a Party-in-Interest,
### In Violation of ERISA § 406(a)(1)(C) and (D),
### 29 U.S.C. § 1106(a)(1)(C) and (D)

103.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

104.     At all relevant times, United was a fiduciary of the ERISA Plans it administered under 29 U.S.C. § 1002(21)(A).

105.     At all relevant times, United was a "party in interest" with respect to the self-funded Plans because it was a fiduciary and service provider to those Plans under ERISA § 3(14)(A)-(B), 29 U.S.C. § 1002(14)(A)-(B).

106.     As fiduciaries, Defendants are prohibited from causing the Plans to "engage in a transaction if [they] know or should know that such transaction constitutes a direct or indirect …furnishing … of services between the plan and a party in interest"

unless the services are reasonable. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2). United's use of self-funded Plans' assets to pay itself fees for recouping overpayments it made while administering self-funded Plans is a breach of this fiduciary duty and a prohibited transaction because the fees it received were unreasonable.

107.    Defendants are prohibited from causing the Plans to "engage in a transaction if [they] know or should know that such transaction constitutes a direct or indirect … transfer to … a party in interest, of any assets of the plan." ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). United's use of self-funded Plans' assets to offset overpayments by fully insured Plans is a breach of this fiduciary duty and a prohibited transaction because United caused Plans to transfer Plan assets designated for benefit payments to United's pockets.

108.    As the direct and proximate result of the above breach of fiduciary duty and prohibited transaction, self-funded Plans have lost hundreds of millions of dollars, for which Defendants are jointly and severally personally liable.

109.    Under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), Plaintiff seeks an order requiring Defendants to restore all losses to self-funded Plans and to disgorge any ill-gotten profits or fees caused by their violations of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), and to provide any other relief set forth in the Prayer for Relief or that is just and proper.

## Count V

### Failure to Establish and Maintain
### Reasonable Claims Procedures

110.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

111.    At all relevant times, United was a fiduciary of the ERISA Plans it administered under 29 U.S.C. § 1002(21)(A).

112.    United owed Plaintiff and the Class a duty to provide adequate notice and a full and fair review of benefit denials and cross-plan offsets under ERISA § 503, 29 U.S.C. § 1133, and the ERISA Claims Regulation, 29 C.F.R. § 2560.503-1.

113.    United breached its fiduciary duties to Plaintiff and the Class by failing to provide timely and adequate notice and a full and fair review of benefit denials and cross-plan offsets in violation of ERISA § 503, 29 U.S.C. § 1133, and the ERISA Claims Regulation, 29 C.F.R. § 2560.503-1.

114.    Plaintiff and the Class were injured as a result of United's failure to provide timely and adequate notice and a full and fair review of benefit denials and cross-plan offsets, because certain offsets resulted in Plaintiff and the Class members not receiving benefits due under the Plan and caused Plaintiff and Class members to incur balance bill liability.

115.    Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks an order requiring Defendants to comply with ERISA's requirements to provide timely notice and

full and fair review of benefit denials in accordance with the ERISA Claims Regulation, 29 C.F.R. § 2560.503-1.

## PRAYER FOR RELIEF

116.    Plaintiff, on behalf of the Class and their ERISA Plans, respectfully request that the Court award the following relief:

A.    Certify the Class, appoint Plaintiffs as Class Representative, and appoint Zuckerman Spaeder LLP, Berger Montague, Lockridge Grindal Nauen, P.L.L.P, Plaintiff's counsel, as Class Counsel;

B.    Declare that United breached its fiduciary duties to Plaintiff and the Class by using cross-plan offsets, in violation of ERISA's fiduciary duty under ERISA, 29 U.S.C. § 1104(a), and in further violation of ERISA's bar against prohibited transactions, ERISA, 29 U.S.C. § 1106, and by violating ERISA's claims procedures under 29 U.S.C. § 1133 through the manner in which it took cross-plan offsets;

C.    Permanently enjoin United from taking cross-plan offsets;

D.    Order United to provide all accountings necessary to determine the amounts it must remit to the Plans under ERISA, 29 U.S.C. § 1109(a), to restore losses and to disgorge any profits United obtained from the use of Plan assets or other violations of ERISA, 29 U.S.C. §§ 1104 or 1106;

E.    Order United to (a) personally make good to the Plans all money taken to fund cross-plan offsets and (b) personally restore to the Plans any and all profits realized by United on account of its cross-plan offsets;

F.      Declare that United has violated the ERISA Claims Regulation and permanently enjoin it from doing so in the future;

G.      Order United to comply with ERISA's requirements to provide timely notice and full and fair review of benefit denials in accordance with the ERISA Claims Regulation, 29 C.F.R. § 2560.503-1;

H.      Award to the Plaintiff and the Class their attorneys' fees and costs under ERISA, 29 U.S.C. § 1132(h), and/or the common fund doctrine;

I.      Order United to pay interest to the extent allowed by law; and

J.      Order all other declaratory, equitable or remedial relief as the Court deems appropriate.


Dated:  June 24, 2022                    Respectfully submitted,

                                         /s/E. Michelle Drake
                                         E. Michelle Drake, Bar No. 0387366
                                         BERGER MONTAGUE PC
                                         1229 Tyler Street NE, Suite 205
                                         Minneapolis, MN 55413
                                         Tel. (612) 594-5999
                                         Fax. (612) 584-4470
                                         emdrake@bm.net

                                         Karen L. Handorf, Esq. (pro hac vice pending)
                                         Julie S. Selesnick, Esq. (pro hac vice pending)
                                         BERGER MONTAGUE PC
                                         2001 Pennsylvania Ave., NW, Suite 300
                                         Washington, D.C. 20006
                                         Tel. (202) 559-9740
                                         Fax (215) 875-4604
                                         khandorf@bm.net
                                         jselesnick@bm.net

D. Brian Hufford, Esq. (pro hac vice pending)
Jason S. Cowart, Esq. (pro hac vice pending)
ZUCKERMAN SPAEDER LLP
485 Madison Avenue, 10th floor
New York, NY 10022
Tel. (212) 704-9660
Fax (212) 704-4256
dbhufford@zuckerman.com
jcowart@zuckerman.com

Karen H. Riebel, Bar No. 219770
Kristen G. Marttila, Bar No. 0346007
Derek C. Waller, Bar No. 0401120
LOCKRIDGE GRINDAL NAUEN, P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel. (612) 339-6900
Fax. (612) 339-0981
khriebel@locklaw.com
kgmarttila@locklaw.com
dcwaller@locklaw.com

*Counsel for Plaintiff*