# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| REBECCA SMITH and CRISTINE M. GHANIM, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 22-cv-01658 (NEB/DJF) |
| v. | |
| UNITEDHEALTH GROUP INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, UNITED MEDICAL RESOURCES, UNITED HEALTHCARE SERVICE LLC, and Doe Defendants 1-10 | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS ALLEGED IN THE COMPLAINT ..................................................... 3

    A.    Plaintiff Smith ........................................................................................ 4

    B.    Plaintiff Ghanim ..................................................................................... 6

    C.    United's Cross-Plan Offset Scheme ....................................................... 7

III.  LEGAL STANDARD ........................................................................................ 10

IV.   ARGUMENT ...................................................................................................... 11

    A.    Plaintiffs Plausibly Allege They Have Article III Standing. ........................... 12

        1.    Plaintiffs Plausibly Allege That United Failed to Pay All of the
              Approved Benefits Due to them Under Their Plans. ..................................... 13

        2.    Plaintiffs Plausibly Allege that United's Offsetting Scheme Subjected
              them to Legal Risks that Would Not Otherwise Exist. ................................ 17

    B.    Plaintiffs Plausibly Allege That United Breached its Fiduciary Duties ........... 23

        1.    Plaintiffs Plausibly Allege United Was Acting as a Fiduciary When it
              Took the Cross-Plan Offsets. ....................................................................... 23

        2.    Plaintiffs Plausibly Allege that the Cross-Plan Offsets Breached
              United's Fiduciary Duties. ............................................................................ 29

V.    CONCLUSION .................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aberdeen Ry. Co. v. Blaikie Bros.*,
(1854) 2 L.R. Eq. 1281 (H.L.) ................................................................... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 10

*Braden v. Wal–Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ..................................................................... 11

*Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*,
168 F.3d 1069 (8th Cir. 1999) ................................................................... 17

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016) ..................................................................... 17

*Central States, Se. & Sw. Area Pension Fund v. Cent. Transp., Inc.*,
472 U.S. 559 (1985) ................................................................................... 26

*Central Valley Ag Cooperative v. Leanard*,
986 F.3d 1082 (8th Cir. 2021) ................................................................... 28

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2019) ............................................................................ 19, 20

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973 (2017) ................................................................................. 14

*Demarais v. Gurstel Chargo, P.A.*,
869 F.3d 685 (8th Cir. 2017) ..................................................................... 14

*Doe v. United Behav. Health*,
523 F. Supp. 3d 1119 (N.D. Cal. 2021) ..................................................... 26

*Du Bois v. Bd. of Regents of Univ. of Minn.*,
987 F.3d 1199 (8th Cir. 2021) ................................................................... 11

*Fed. Election Comm'n v. Akins,*
  524 U.S. 11 (1998) ............................................................................ 22

*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014) .................................................................... 26, 31

*Gillick v. Elliott,*
  1 F.4th 608 (8th Cir. 2021) .............................................................. 21

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
  607 F.3d 453 (7th Cir. 2010) ........................................................... 14

*HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.,*
  240 F.3d 982 (11th Cir. 2001) .................................................... 16, 19

*Hecker v. Deere & Co.,*
  556 F.3d 575 (7th Cir. 2009) ........................................................... 28

*Jackson v. Smith,*
  254 U.S. 586 (1921) .......................................................................... 23

*Keech v. Sandford,*
  (1726) 37; 25 Eng. Rep. 223 (Ch.) ................................................... 23

*Lutz Surgical Partners PLLC v. Aetna, Inc.,*
  No. 3:15-cv-02595(BRM)(TJB), 2021 WL 2549343 (D.N.J. June 21,
  2021) ................................................................................................ 32

*Magruder v. Drury,*
  235 U.S. 106 (1914) .......................................................................... 23

*Martin v. Feilen,*
  965 F.2d 660 (8th Cir. 1992) ........................................................... 26

*McCaffree Fin. Corp. v. Principal Life Ins. Co.,*
  811 F.3d 998 (8th Cir. 2016) ..................................................... 24, 28

*Michoud v. Girod,*
  45 U.S. (4 How.) 503 (1846) ............................................................ 23

*Mitchell v. Blue Cross Blue Shield of N. Dakota,*
  953 F.3d 529 (8th Cir. 2020) ......................................... 15, 16, 18, 19

*MSPA Claims 1, LLC v. Tenet Fla., Inc.,*
  918 F.3d 1312 (11th Cir. 2019) ....................................................... 14

iv

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
    781 F.3d 182 (5th Cir. 2015) ................................................................ 16, 19

*Peterson on behalf of E v. UnitedHealth Grp. Inc.*,
    913 F.3d 769 (8th Cir. 2019) ........................................................ 32, 33, 34

*Peterson on behalf of Patients E, I, K, L, N, P, Q, & R v. UnitedHealth Grp. Inc.*,
    242 F. Supp. 3d 834, 838 (D. Minn. 2017) ................................... 21, 22, 32

*Peterson v. UnitedHealth Grp.*,
    2017 WL 3994970 (8th Cir. Sept. 7, 2017) ......................................... 33, 34

*Pontes v. Rowan Univ.*,
    2021 WL 4145119 (3d Cir. Sept. 13, 2021) ............................................... 14

*Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*,
    413 F.3d 897 (8th Cir. 2005) .................................................................... 11

*Pub. Citizen v. U.S. Dep't of Just.*,
    491 U.S. 440 (1989) .................................................................................. 22

*Reich v. Lancaster*,
    55 F.3d 1034 (5th Cir. 1995) .................................................................... 26

*Rozo v. Principal Life Ins. Co.*,
    949 F.3d 1071 (8th Cir. 2020) ....................................................... 27, 28, 29

*Santomenno v. Transamerica Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) .................................................................... 28

*Scott v. UnitedHealth Group, Inc.*,
    540 F. Supp. 3d 857 (D. Minn. 2021) ......................................... 13, 15, 19

*Southcentral Found. v. Alaska Native Tribal Health Consortium*,
    983 F.3d 411 (9th Cir. 2020) .................................................................... 22

*Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ............................................................ 16, 19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ....................................................................... 12, 22

*Springer v. Cleveland Clinic Emp. Health Plan Total Care*,
    900 F.3d 284 (6th Cir. 2018) ............................................................ 16, 19

*Stuart v. State Farm Fire & Cas. Co.*,
    910 F.3d 371 (8th Cir. 2018) ............................................................ 20

*In re SuperValu, Inc.*,
    870 F.3d 763 (8th Cir. 2017) ...................................................... 16, 17

*Thole v. U.S. Bank, N.A.*,
    140 S. Ct. 1615 (2020) ...................................................... 13, 14, 15

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .......................................................... 12, 15

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ........................................................ 14

*United States v. Carter*,
    217 U.S. 286 (1910) .................................................................. 23

*Van v. LLR, Inc.*,
    962 F.3d 1160 (9th Cir. 2020) ...................................................... 14

*Vogt v. State Farm Life Ins. Co.*,
    963 F.3d 753 (8th Cir. 2020) ........................................................ 20

*Whelpdale v. Cookson*,
    (1747) 27 Eng. Rep. 856 (Ch.) ...................................................... 23

**Statutes**

29 U.S.C. § 1002 ................................................................ 23, 31

29 U.S.C. § 1104 .................................................. 26, 29, 30, 31

29 U.S.C. § 1106 ............................................................. *passim*

29 U.S.C. § 1108 ................................................................ 33, 34

29 U.S.C. § 1133 ........................................................................ 31

**Other Authorities**

29 C.F.R. § 2560.503-1 ................................................................ 21

3 Austin Wakeman Scott et al., *Scott and Ascher on Trusts* § 17.2 (5th ed.
    2007) .................................................................................. 23

Bogert's Law of Trusts & Trustees § 862 (Update June 2020) .......................................... 23

*Office of Pension and Welfare Benefit Programs (E.R.I.S.A.)* Op. No. 77-34, 1977 WL 5397 (Apr. 4, 1977) ................................................................ 34

*Office of Pension and Welfare Benefit Programs (E.R.I.S.A.)* Op. No. 81-62A, 1981 WL 17785 (July 21, 1981) ......................................................... 34

Restatement (Third) of Trusts § 78(1) .............................................................................. 23

For the reasons explained below, Plaintiffs Rebecca Smith and Cristine M. Ghanim oppose the Motion to Dismiss Amended Complaint, ECF No. 43 (the "Motion") filed on October 28, 2022 by Defendants UnitedHealth Group Inc., United Healthcare Services, Inc., United Healthcare Insurance Company, United Medical Resources, United Healthcare Service LLC, and Doe Defendants 1-10 (collectively, "United").

## I.    **INTRODUCTION**

Defendants' convoluted brief is heavy on United's factual assertions, rhetorical flourishes, and policy arguments about the alleged importance of cross-plan offsetting. It is light on anything that might actually justify dismissing the Complaint.[1]

Plaintiffs' claims are simple. They allege United agreed their plans owed them (collectively) nearly $56,000.00 in benefits, but that instead of using their plans' assets to pay those benefits, United used the money to effectuate illegal cross-plan offsets. Plaintiffs allege detailed facts demonstrating that United's cross-plan offsets are prohibited transactions under the Employee Retirement Income Security Act of 1974 ("ERISA"), because they use plan assets—meant for plan participants and beneficiaries—to benefit United. Plaintiffs' Article III injuries and Defendants' status as fiduciaries are plausible from even a cursory review of the Complaint.

Plaintiffs allege Article III injuries that have been recognized as justiciable since the country's founding, and which arise from fiduciary duties that have been codified in

---

[1] In this brief, Plaintiffs refer to their First Amended Class Action Complaint, ECF No. 35 (Sept. 30, 2022), as the "Complaint." Plaintiffs refer to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Complaint, ECF No. 43 (Oct. 28, 2022) as Defendant's "brief" or the "MTD."

ERISA, including the duty of loyalty and the prohibited transaction rules. Plaintiffs allege that they were injured because their benefit claims were not paid in compliance with federal law or their plan language, and because United's failure to pay their benefits in cash exposed them to a host of risks that would not otherwise exist.. No more is required. It really is as simple as that.

Defendants also wildly miss the mark when they contend Plaintiffs did not plausibly plead that United's cross-plan offsets were *United's* fiduciary acts. To the extent Plaintiffs' plan language purports to authorize illegal cross plan offsets, the Complaint alleges that United misled Plaintiffs' employers into including that language in their plans. More importantly, however, the Complaint alleges that only United (and not Plaintiffs' employers) has or exercises any discretion regarding which (if any) claims to offset, in what amounts, and when (if ever) to do so. Stated differently, the Complaint alleges that while the plans may have given United the discretion to take cross-plan offsets, United— and only United—made the discretionary decisions that Plaintiffs' providers owed different ERISA plans money, made the decisions to recover these alleged debts through offsets, made the decisions to use Plaintiffs' benefit entitlements to fund the offsets, made the decisions that Plaintiffs were entitled to almost $56,000.00 in benefits, made the decisions to pay only about $42,000.00 of this amount in cash and to send the remaining $14,000 to the other plans that were supposedly owed money by the providers, and then made the decision to mislead Plaintiffs about what was happening. It is more than plausible—indeed, it is beyond peradventure—that these were United's fiduciary acts.

2

Finally, United makes almost no effort to argue that Plaintiffs failed to plausibly allege that United's cross-plan offsetting scheme is illegal. The allegations in the Complaint lay out in detail how United violated ERISA's prohibited transaction provisions when it engaged in cross-plan offsetting. United's cross-plan offsetting presents a serious fiduciary conflict of interest and is a stark example of fiduciary self-dealing in violation of 29 U.S.C. § 1106(b)(1) and (2). United's Motion should be denied.

## II.   <u>FACTS ALLEGED IN THE COMPLAINT</u>

Plaintiffs are participants in employer-sponsored health plans governed by ERISA. Compl. ¶¶ 14-15. Plaintiffs' plans are self-funded,[2] and United serves as the claims administrator for both plans. *Id.* As a claims administrator, United has a wide range of responsibilities, including accepting and processing claims for benefits due under the plans for healthcare services received by the plan members, determining whether the claimed services are covered under the plan terms, and (if so), issuing payment of the "allowed amount" of benefits to the health care providers on the plan members' behalf. *Id.* ¶¶ 1, 44.

Approximately fifteen years ago, United concocted an idea for clawing back overpayments it had mistakenly issued to providers. *Id.* ¶ 26. It pitched this idea to its self-funded plan clients as a new method for easily and inexpensively recovering plan assets that would benefit all participating plans *Id.* ¶¶ 30, 33. In reality, this scheme has yielded

---

[2] United administers two types of employer-sponsored plans. "Fully insured" plans are underwritten by United, meaning United pays benefits for the participants' and beneficiaries' covered healthcare expenses from its *own* assets. Compl. ¶ 1. Under "self-funded" plans, United pays participants' covered healthcare expenses from the *plan's* assets, which are funded through contributions from the plan-sponsoring employer and participating employees. *Id.* ¶¶ 1, 14, 15, 43.

billions of dollars in profits for United itself. *Id.* ¶¶ 3, 63-64. United calls this profitable program its "Overpayment Bulk Recovery Process," *id.* ¶ 30, but it is more commonly known as cross-plan offsetting. United makes a cross-plan offset when it determines that one of the plans it administers owes benefits to one of the plan's members for covered healthcare services rendered by a provider, but instead of using that plan's assets to pay the member's provider the full amount of benefits due, United diverts some or all of the payment to reimburse an entirely different plan—under which United had previously approved a benefits claim and paid the same provider, only to unilaterally determine after the fact that it had overpaid the claim. *Id*. ¶¶ 2, 26. And at no point during this process does United inform the participant whose claim is offset that the offset occurred. *Id.* ¶¶ 82, 91. Instead, it sends false explanation of benefits ("EOB") forms to members whose claims are offset, which are written as if the allowed amount has been paid to the provider in full. *Id.*

### A.      Plaintiff Smith

Rebecca Smith is a beneficiary of the Jacobs Engineering Group Inc. Medical Plan ("Jacobs Plan"), a self-funded health benefits plan sponsored by her husband's employer and administered by United. *Id*. ¶ 14. She and her husband contribute $145 every two weeks to help cover some of the cost of their healthcare. *Id*. In November 2020, Rebecca Smith received spinal surgery from her surgeon, Dr. Ara Deukmedjian, who is out-of-network with United. *Id*. ¶¶ 75-76. Dr. Deukmedjian's practice, Sierra Center of Viera ("SCV"), billed Ms. Smith $109,360.00 for the procedure and submitted a claim to United on Ms. Smith's behalf for that amount. *Id*. ¶ 75. Although United approved coverage for the surgery, it initially only allowed $3,420.36 of the billed charges as payable under the

Jacobs Plan. *Id.* After negotiating with United's agent, SCV agreed to accept $56,390.18 as full payment for Ms. Smith's surgery, *id.* ¶ 77, and United decided that $56,390.18 was the allowed amount for the surgery under Ms. Smith's plan. *Id.* ¶ 81. According to United, Ms. Smith owed $12,597.87 of the revised allowed amount as her coinsurance payment, and United had previously paid $1,710.18 in benefits when it originally processed the claim. *Id.* Subtracting those sums from the revised "allowed amount," United determined that the total amount of benefits due for Ms. Smith's surgery was $42,082.13, which United was supposed to cause Ms. Smith's plan to pay to SCV on Ms. Smith's behalf. *Id.* ¶¶ 81-82. But United only paid SCV $39,458.99, leaving $2,623.14 of the approved benefits unpaid and hiding the underpayment from Ms. Smith by failing to disclose in the EOB it sent to her that it had decided to use a portion of her benefits to pay itself through an "offset." *Id.* ¶¶ 81, 82, 85, 87. By failing to disclose the offset to Ms. Smith, United also deprived her of the opportunity to appeal the offset decision. *Id.* ¶¶ 49-50, 72-73.

In communications it sent only to SCV, United claimed that SCV had previously been overpaid for surgical services to an entirely unrelated patient, C.K., who was insured under an entirely different plan—a fully insured plan where United was responsible for paying benefits from its own assets. *Id.* ¶ 84. Even though SCV disputed that any overpayment had even occurred, *id.*, and even though SCV did not agree to resolve the disputed overpayment in this manner, *id.*, United unilaterally deducted from its payment of *Ms. Smith's* benefits the amount it claimed *SCV* owed *United* due to United's own alleged overpayment of benefits under *C.K.*'s fully insured plan. *Id.* ¶¶ 85-86. In other

words, United took a portion of the benefits due to Ms. Smith under her plan and, instead of paying them to her provider as Ms. Smith had directed, kept them for itself.

**B.     Plaintiff Ghanim**

Christine Ghanim is a participant in the Finance of America Companies High Plan, a self-funded health benefits plan sponsored by her employer, Finance of America Holdings, LLC ("FOA Plan"), and Ms. Ghanim contributes to the costs of the FOA plan. *Id*. ¶ 15. In August and September 2020, Ms. Ghanim received health care services from her out-of-network provider, Dr. Michael Jadali. *Id*. ¶ 89. Dr. Jadali submitted a claim to United on Ms. Ghanim's behalf for his full billed charge of $34,000.00, *id*., of which United decided the "allowed amount" was just $14,040.00. *Id*. ¶ 90. After making deductions purportedly based on its billing policies and applying Ms. Ghanim's deductible and co-insurance, United represented to Ms. Ghanim that a total of $8,015.88 in approved benefits were due under her plan and that it paid those benefits directly to Dr. Jadali on her behalf. *Id*. United failed to disclose to Ms. Ghanim that it had chosen to use her benefits to pay itself through an offset. *Id.* ¶ 91. By failing to disclose the offset to Ms. Ghanim in its EOBs, United deprived her of the opportunity to appeal the offset decisions. *Id*. ¶¶ 49-50, 72-73.

Despite representing otherwise to Ms. Ghanim, United never paid Dr. Jadali for the services he provided to her. *Id*. ¶ 91. In communications sent only to Dr. Jadali, United claimed that it had previously overpaid Dr. Jadali for services he had provided to an entirely unrelated patient, J.C., who was a member of an entirely different plan—again, a fully insured plan. *Id*. ¶ 92. Even though Dr. Jadali disputed the overpayment and objected to

6

United's self-help, *id.*, United unilaterally deducted from its payment of *Ms. Ghanim's* benefits the amount it claimed *Dr. Jadali* owed *United* due to United's own alleged overpayment of benefits under *J.C.*'s fully insured plan. *Id.* ¶¶ 92-93. United later repeated the scheme, keeping for itself another $2,949.31 of Ms. Ghanim's benefits for covered healthcare services she received on a number of subsequent visits, instead of using them to pay her doctor for those visits as it had promised to do on her behalf. *Id.* ¶ 95. In total, United took $10,958.82 of the benefits due to Ms. Ghanim under her plan and, instead of paying them to her provider as Ms. Ghanim had directed, kept them for itself.

### C.    United's Cross-Plan Offset Scheme

It is no coincidence that Plaintiffs Smith and Ghanim had exactly the same experience: they were both victims of United's "Overpayment Bulk Recovery Process," a comprehensive scheme United devised to increase its own profits and serve its own interests at the expense of the ERISA plan participants and beneficiaries to whom it owes fiduciary duties.

As an administrator of thousands of ERISA plans, United processes claims for benefits to cover treatment provided to plan participants and beneficiaries by their healthcare providers. Compl. ¶ 1. It is United's job to determine whether the treatment is covered under the patient's plan and, if so, to determine the amount of benefits due under the plan and then to pay those approved benefits on the plan's behalf. *Id.* Typically, United pays the approved benefits directly to the healthcare provider on the plan participant's behalf. *Id*. When a plan is self-funded, United withdraws the benefits due and makes

payment from the plan's funds; when a plan is fully insured, United pays the benefits due from its own funds. *Id.*

Unfortunately, United's electronic claims-processing algorithms are fraught with errors, frequently causing it to pay providers more than the amount actually due under the plan terms. *Id*. ¶¶ 62-64. When United later determines that it made such an "overpayment," it seeks to "recover" those funds on behalf of the plan that made the overpayment. *Id*. ¶ 26. But rather than treating recovery of a given overpayment as a discrete transaction between the plan that overpaid and the overpaid provider, United has developed a comprehensive self-help scheme—its "Bulk Recovery Process," *id.* ¶ 32—that abuses its unfettered control over the funds of thousands of plans and turns the process of reversing its own negligent overpayments into a cash cow that benefits United above all. *See*, e.g., *id.* ¶¶ 46, 62, 63.

Put simply, when United unilaterally determines that it overpaid a provider for benefits due under one plan ("Plan A") for services to a given plan participant ("Participant A"), its first step is to issue a repayment demand to the provider. *Id.* ¶¶ 26, 33. If the provider declines to pay back the money voluntarily, United (again unilaterally) proceeds to take back the purported overpayment through a "cross-plan offset." *Id.* ¶ 26.[3] This means that when another patient ("Participant B") later obtains covered services from the same provider, rather than paying out the benefits due to Participant B under their plan

---

[3] Notably, United engages in cross-plan offsets without ever obtaining any legal determination that the provider was actually overpaid or owes any actual debt. Compl. ¶ 35.

("Plan B"), United uses some or all of Participant B's benefits to repay Plan A for its alleged overpayment. *Id.* ¶¶ 26, 33, 34, 63. United dubs this nonpayment of Participant B's benefits an "offset" against the debt United claims the provider owes Plan A. United then misleadingly represents to Participant B that United made payment in full to the provider, never disclosing that it "paid" the provider by "offsetting" a disputed debt. *Id.* ¶¶ 57, 82, 90. Thus, a cross-plan offset enables United to cover up its own mistake in (allegedly) over-paying benefits due under Plan A by secretly misappropriating benefits due to a beneficiary of Plan B. *See*, *e.g.*, *id.* ¶ 63.

United's misdirection of Participant B's benefits is bad enough—but United's scheme gets even worse, as it engages in self-dealing on both sides of a cross-plan offset transactions when it takes a fee for its "services." If Plan A is a self-funded plan, United *also* keeps a portion of Participant B's benefits for itself as a "savings fee" for "recovering" the overpayment on Plan A's behalf (even if the supposed overpayment, if it occurred, resulted from United's own error). *Id.* ¶¶ 27, 34, 42, 46, 65. Because United takes a cut of Participant B's benefits before misdirecting them to Plan A's account, the non-payment to Participant B ends up being even larger than the amount of the supposed "offset" to the overpayment by Plan A. *E.g., id.* ¶ 65. If Plan A is fully insured, United takes all of the "offset" Participant B benefits and deposits them directly into its own account. *Id.* ¶ 34. In both cases, United profits at Participant B's expense and misuses Plan B assets. *Id.* ¶ 52. At the same time, the Bulk Recovery Process allows United to avoid penalties or liability to Plan As for its own negligence in making overpayments in the first place. *Id.* ¶¶ 62-63.

The amount of money United makes through its cross-plan offsetting scheme is astonishing. United recoups more than $1 billion per year through its Bulk Recovery Process. *Id*. ¶¶ 3, 64, 99. From 2018 to 2020, United collected $405-$599 million per year from self-funded Plan Bs to repay alleged overpayments by fully insured Plan As, *id*. ¶ 63, all of which went directly into United's pocket. *Id*. ¶¶ 34, 63. In the same time period, United recovered $755-$881 million per year for self-funded Plan As, subject to United's self-serving "savings fees." *Id*. ¶ 64. Since United keeps all of the amounts it takes on behalf of fully insured plans, it is not surprising that its rate of overpayment "recovery" is substantially higher for fully insured Plan As than self-funded ones. *Id.* ¶ 64 (in 2018, United recovered 81% of overpayments it made from self-funded plans but 91% of overpayments from fully insured plans, with a similar disparity in 2019).

In short, United's scheme pours profits into its own pockets while helping it avoid financial responsibility for its mistakes in administering Plan As—all at the expense of the thousands of Plan B participants and beneficiaries, like Plaintiffs Smith and Ghanim— whose benefits United misdirected for its own purposes, in violation of ERISA's prohibited transaction rules and United's fiduciary duty of loyalty.

## III.   **LEGAL STANDARD**

To survive dismissal, a complaint need not contain detailed factual allegations, merely "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). That is, a proper complaint need only allege facts sufficient to nudge the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. On a

motion to dismiss, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1202 (8th Cir. 2021).

## IV.   <u>ARGUMENT</u>

"Congress enacted ERISA to regulate comprehensively certain employee benefit plans and to protect the interest of participants in these plans by establishing standards of conduct, responsibility, and obligations for fiduciaries." *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 906–07 (8th Cir. 2005) (cleaned up). Private civil litigation to prevent "misuse and mismanagement of plan assets" is key to "ERISA's remedial purpose and evident intent." *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (cleaned up). In particular, "Congress intended that private individuals would play an important role in enforcing ERISA's fiduciary duties—duties which have been described as the highest known to the law." *Id.* at 598 (cleaned up). Especially in light of the practical reality that ERISA plaintiffs "generally lack the inside information necessary to make out their claims in detail" without discovery, the Eighth Circuit has determined that is "sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of what the claim is and the grounds upon which it rests,' and 'allow the court to draw the reasonable inference' that the plaintiff is entitled to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Plaintiffs' allegations easily meet this standard.

Here, Plaintiffs plausibly allege—in considerable detail—that United made the discretionary fiduciary decision to use the money Plaintiffs were owed by their plans to

facilitate cross plan offsets, that United breached its fiduciary duties to Plaintiffs when it did so, and that the cross-plan offsets resulted in actual harm to Plaintiffs.

### A.   Plaintiffs Plausibly Allege They Have Article III Standing.

Article III of the Constitution guards the separation of powers by "confin[ing] the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A case or controversy exists when the plaintiff has a "'personal stake' in the case—in other words, standing.'" *Id.* (cleaned up). As the Supreme Court recently put it, to have standing, a plaintiff "must be able to sufficiently answer the question: 'What's it to you?'" *Id.* (cleaned up). Plaintiffs Smith's and Ghanim's answer to that question is simple: they allege United took their health plan benefits, used the money for its own purposes instead of paying their doctors, and then lied to them about it. *See* §§ II.A & B, *supra; see also*, *e.g.*, Compl. ¶¶ 87, 91, 95. What's it to Plaintiffs? They are the victims of an illegal scheme that systematically deprives employees of benefits due under their federally-regulated employee health plans, and they want the benefits they are owed to be paid to their doctors on their behalf—not to some other plan. United's argument that, under Article III, the federal courts have no power to even hear this case, is flat wrong.

The Supreme Court has developed a three-element test to determine whether a plaintiff has a sufficient personal stake in a case to establish standing: a plaintiff must have "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also TransUnion*, 141 S. Ct. at 2203. United does not dispute the second two elements, but contends that Plaintiffs fail to "clearly

allege facts demonstrating" the first element: injury in fact. MTD at 11 (quoting *Thole v.*

*U.S. Bank, N.A.*, 140 S. Ct. 1615, 1618 (2020)). United is wrong: the Complaint alleges in

detail that Plaintiffs have suffered at least two concrete injuries-in-fact, and United offers

no more than straw-man arguments to the contrary.

1.    <u>Plaintiffs Plausibly Allege That United Failed to Pay All of the
Approved Benefits Due to them Under Their Plans.</u>

As the Complaint alleges, United did not pay, in full, the benefits due to Plaintiffs

under their plans. Compl. ¶¶ 75-95. In both cases, the Plaintiff received medical services

that were covered under her plan and *approved* by United. *Id*. ¶¶ 75, 89. United determined

what the "allowed amount" was under each Plaintiff's plan for the services she received.

*Id*. ¶¶ 75-78, 81, 90. United told each Plaintiff in an EOB that it had paid the allowed

amount in full to her healthcare provider (after applying the Plaintiffs' deductibles and co-

insurance). *Id*. ¶¶ 81, 90. But in fact, United did *not* pay the full allowed amount to either

Plaintiff's provider, ¶¶ 82, 87, 90, 95, instead using some or all of the benefits due to repay

a debt United claimed the provider owed to some other plan, *id*. ¶¶ 82-86, 90-95 through

prohibited transactions that violate ERISA.[4] *See* 29 U.S.C. § 1106. And because United

failed to disclose the offsets to the Plaintiffs, United deprived them of their contractually

---

[4] These allegations distinguish this case from both *Thole* and *Scott*, on which United relies,
MTD at 3, 11-12, where the plaintiffs were not able to identify any dispute over a benefit
payment. In *Thole*, the plaintiffs were guaranteed a set amount of benefits, which had been
paid. 140 S. Ct. at 1618. In *Scott*, the plaintiffs challenged the legality of cross-plan offsets,
but without ever having been subjected to such offsets themselves. *Scott v. UnitedHealth
Group, Inc*., 540 F. Supp. 3d 857, 864 (D. Minn. 2021). Here, by contrast, Plaintiffs allege
that United directly and concretely injured them by relying on an illegal transaction to
avoid paying Plaintiffs' providers the full amount of approved benefits due.

13

guaranteed right to appeal United's misuse of their approved benefits. *Id.* ¶¶ 59-60 (describing plan terms providing for administrative appeal); *see also id.* ¶¶ 72-73 (describing ERISA Claims Regulation requiring notification and appeal rights).

There is no question that an underpayment or non-payment of approved benefits due under an ERISA plan qualifies as concrete, particularized injury-in-fact for the shortchanged plaintiff. Here, United itself determined the Plaintiffs were entitled, under their respective plans, to a sum certain in benefits, but instead of paying that amount as it was directed to do, United took portions of the money for its own use. Plaintiffs' loss of money to which they are entitled is sufficient to meet the injury-in-fact element of Article III. *See*, *e.g.*, *id.; see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017) (same).[5] The Supreme Court even recognized as much in *Thole*, observing that if the plaintiffs in that case "had not received their vested pension benefits, they would of course have Article III standing

---

[5] *See also*, *e.g.*, *Van v. LLR, Inc.*, 962 F.3d 1160, 1164 (9th Cir. 2020) ("[W]e hold that the temporary loss of use of one's money constitutes an injury in fact for purposes of Article III."); *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("The inability to have and use money to which a party is entitled is a concrete injury."); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010) ("Every day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money."); *Pontes v. Rowan Univ.*, 2021 WL 4145119 at *4 n.5 (3d Cir. Sept. 13, 2021) (noting circuit case law holding that the loss of the use of money is itself sufficient concrete injury to establish standing); *cf. In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 66 (D.C. Cir. 2019) (per curiam) (addressing damages rather than standing and noting that "[t]he delay in those Plaintiffs' receipt of their refunds, and the forgone time value of that money, is an actual, tangible pecuniary injury").

to sue. . . ." *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615, 1619 (2020). *Cf. also Scott*, 540 F. Supp. 3d at 864 (recognizing that non-payment of benefits through cross-plan offsetting is "a type of injury that is sufficient to establish standing under *Thole*," but finding that the plaintiffs therein lacked standing because they had not been subjected to cross-plan offsets).

The Supreme Court has repeatedly stated that "[h]istory and tradition offer a meaningful guide to the types of cases Article III empowers federal courts to consider." *TransUnion*, 141 S. Ct. at 2204 (citations omitted). "And with respect to the concrete-harm requirement in particular," the Supreme Court instructs courts to "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id*. (quoting *Spokeo,* 578 U.S. at 341). Even *intangible* harms are concrete if they have a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id*.

Here, Plaintiffs' injury is both tangible and firmly rooted in long-recognized causes of action. By engaging in the illegal offsets, United failed to pay Plaintiffs the benefits they were undisputedly owed under the terms of their plans. As the Eighth Circuit has held, the harm caused by a wrongful denial of ERISA plan benefits is analogous to the harm resulting from a breached contract, which has been traditionally recognized as providing a basis for a lawsuit in American courts. *See, e.g.*, *Mitchell v. Blue Cross Blue Shield of N. Dakota*, 953 F.3d 529, 536 (8th Cir. 2020) (noting that because plan participants are contractually entitled to plan benefits, the wrongful denial of plan benefits deprives the participant of the benefit of their bargain, which constitutes an injury to the participant.).

15

For that reason, "the denial of plan benefits constitutes a cognizable injury in fact for purposes of constitutional standing." *Id.* (citing as persuasive cases holding that ERISA plan participants are injured "when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan"). *See also Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) (participant "suffered an injury within the meaning of Article III because he was denied health benefits he was allegedly owed under the plan"); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289-91 (9th Cir. 2014) (provider with assignment had Article III standing because the participant "had the legal right to seek payment" pursuant to their plan); *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 193 (5th Cir. 2015) (finding Article III standing because the participant whose claim for benefits was not paid did not receive "the benefit of her bargain" under her plan); *HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001) (finding provider-assignee had standing to sue for recovery of benefits due). Here, United did not even deny Plaintiffs' claims for benefits: it *approved* coverage, but then failed to pay.

United does not (and cannot) dispute that a loss of benefits due to a plaintiff under an ERISA plan easily qualifies as Article III injury in fact. Instead, United starts from the premise that the Plaintiffs "*have* received the benefits promised by their plans." MTD at 12 (emphasis added). But this argument is a non-starter: the Court must take Plaintiffs' allegations as *true*, not credit their opposite. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017) (at pleading stage, court accepts as true allegations as to elements of standing,

16

"drawing all inferences in plaintiffs' favor"). It is no help that United's assertion of full payment depends on its assumption that "retiring a debt the [Plaintiffs'] providers owed to other plans" qualifies as payment of the benefits due to Plaintiffs. MTD at 12. That is exactly what the case is about: whether United's practice of "offsetting" a provider's alleged debt to Plan A is a prohibited transaction and thus, not a legal and sufficient method of paying the benefits due to Participant B under Plan B. United cannot dispute Plaintiffs' standing by ignoring Plaintiffs' allegations and simply assuming it already won the case on the merits. *See*, *e.g.*, *SuperValu*, 870 F.3d at 768; *see also*, *e.g.*, *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016) (cautioning against "conflat[ing] Article III's requirement of injury in fact with a plaintiff's potential causes of action"); *Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis,* 168 F.3d 1069, 1074 (8th Cir. 1999) ("We repeat the fundamental principle that the ultimate merits of the case have no bearing on the threshold question of standing."). Stripped of United's mischaracterization of its non-payment of benefits as "payment," the facts alleged in the Complaint reveal United's "Bulk Recovery Process" for what it is: an abusive self-help scheme through which United misappropriated ERISA plan benefits that belonged to the Plaintiffs. *See* § II, *supra*. Plaintiffs could hardly allege a more obviously cognizable injury in fact.

2.   Plaintiffs Plausibly Allege that United's Offsetting Scheme Subjected them to Legal Risks that Would Not Otherwise Exist.

Even if the Court credited United's offset-as-payment characterization (which it should not, because cross-plan offsets are prohibited transactions under ERISA, *see* § IV.B.2, *infra*), Plaintiffs plausibly allege that they were nevertheless injured by United's

scheme because the offset "payment" is subject to a cloud on its legitimacy and value that would not apply if United had paid the benefits with money, as contemplated under Plaintiffs' plans. Compl. ¶¶ 32-33, 66, 68-69. As the Eighth Circuit explained in *Mitchell*, "[t]raditionally, 'a party to a breached contract has a judicially cognizable injury for standing purposes' because the other party's breach devalues the services for which the plaintiff contracted and deprives them of the benefit of their bargain." 953 F.3d at 536 (quoting *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 716 (8th Cir. 2017)); *see also id.* (noting Congress passed specifically to "protect contractually defined benefits") (cleaned up). United's failure to pay Plaintiffs' benefits using a legal method permitted by their plans likewise deprived Plaintiffs of the benefit of their bargain. Indeed, United *admits* that its scheme subjects plan participants to legal risks that otherwise would not exist—for example, the risk that their provider will not consider the payment-through-offset to be "valid payment for his services." *Id.* ¶ 68; *see also id.* ¶ 69 (United acknowledging that "certain" providers alleged in lawsuits that "an offset amounts to non-payment of currently pending claims."). The uncertain status of the payments-by-offset creates risks that a provider may bill the patient for the outstanding amount, or even sue the patient for non-payment. *Id.*; *see also id.* ¶ 56 (plan language acknowledging that providers may bill the patient for "any amounts the Plan does not pay"); *id.* ¶ 69 (at least some providers consider offsets to be non-payment).

United tries to undercut this theory of injury by reducing it to a narrow concern about "balance billing," which United contends only becomes concrete *after* a provider sends the patient a bill for the offset amount. MTD at 13-14. But even that argument ignores

well-established law in this Circuit and others that an illegal denial of ERISA plan benefits qualifies as Article III injury *regardless* of whether the provider has balance-billed the patient. *See*, *e.g.*, *Mitchell*, 953 F.3d at 536 (finding persuasive the reasoning of cases holding that ERISA "plan participants are injured not only when an underpaid healthcare provider charges them for the balance of a bill; they are also injured when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan."); *see also Springer* 900 F.3d at 292; *Spinedex*, 770 F.3d at 1289-91; *N. Cypress*, 781 F.3d at 193; *HCA Health*, 240 F.3d at 991 n.19.[6] As the Eleventh Circuit explained in *HCA Health* (on which the Eighth Circuit relied as persuasive in *Mitchell*), Article III injury arises from the *risk* that the provider *will* balance bill the patient in the future. 240 F.3d at 991 n.19 (rejecting argument that provider-assignee lacks standing because he had not balance-billed the patient assignor). The risk itself constitutes a present, existing injury: rather than having a clear, settled account with their healthcare providers, Plaintiffs now have a clouded, uncertain account that subjects them to new, previously non-existent legal risks.[7]

---

[6] Contrary to United's misleading argument, MTD at 3-4, Judge Schiltz did not suggest in *Scott* that whether cross-plan offsets give rise to Article III injury depends on whether the plaintiff's provider had balance-billed or threatened to do so. *See generally, Scott*, 540 F. Supp. 3d 857.

[7] For this reason, United's reliance on cases addressing Article III injury premised solely on speculative future harm, like *Clapper v. Amnesty International USA*, 568 U.S. 398 (2019), is misplaced. *Clapper* involved a statutory claim under the Foreign Intelligence Surveillance Act of 1978, and the plaintiffs asserted they had suffered Article III injury because there was a reasonable likelihood that their communications with their foreign contacts would be intercepted in the future. 568 U.S. at 401. The plaintiffs did not allege their communications had already been intercepted, nor did they argue that their injury was

In addition to the legal uncertainty United's offset-as-payment scheme imposes on the *fact* of payment, it creates uncertainty as to the *amount* of payment as well. As alleged in the Complaint, when United "pays" a Plan B participant's benefits via offset, rather than transferring money to the provider to pay for the eligible expenses Participant B incurred, all United really does is send Participant B's provider "a letter informing them that their alleged debt to another Plan [that is, Plan A] has been reduced." Compl. ¶ 66. But "paying the provider via the transfer of money is inherently more valuable to the plan participants and beneficiaries than United's unilateral assertion that those patients' debts have been satisfied." *Id.*

This is why, even if United's argument that Plaintiffs' benefits were "paid" through their providers' debt cancellation had merit (it does not), Plaintiffs would still have a contract claim that gives them Article III standing. *See Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 766 (8th Cir. 2020) (rejecting argument that contract holder lacked Article III standing because improperly charged fees were offset by credits); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018) (rejecting argument that policyholders alleging insurer improperly withheld certain sums under the policy did not have Article III standing because they ultimately recouped the withheld payments). Here, Plaintiffs' Article III standing is even more obvious because the payment owed to them was used to extinguish the debt of a third party.

---

analogous to a harm traditionally recognized as providing a basis for a lawsuit in American courts. The discussion in *Clapper* concerning impending injury is not relevant here, where the contract has already been breached and Plaintiffs have already suffered injury.

In any event, United's allegations in its brief that Plaintiffs' providers could have been paid through debt cancellation, MTD at 8, are immaterial to the Article III standing analysis.[8] In making this argument, United improperly conflates Plaintiffs' rights and interests with those of their providers. "United has fiduciary obligations under ERISA to the patients, not the providers." *Peterson on behalf of Patients E, I, K, L, N, P, Q, & R v. UnitedHealth Grp. Inc.*, 242 F. Supp. 3d 834, 838 (D. Minn. 2017) ("*Peterson I*"). Plaintiffs—as Plan B participants—have no obligation to compensate other plans (the Plan As) for overpayments made on behalf of other participants in those plans.[9]

Nor could Plaintiffs challenge whether the Plan A claims subject to those offsets had, in fact, been overpaid; Plaintiffs are not participants in those plans, are not privy to information about the claims, and have no rights to contest the overpayments. *See* Compl. ¶¶ 73, 81, 87, 90-91.[10] Plaintiffs are at the mercy of their providers (who may not have

---

[8] Of course, since United's asserted facts are neither alleged in the Complaint nor based on documents referenced in the Complaint, the Court may not consider them at all. *See*, *e.g.*, *Gillick v. Elliott*, 1 F.4th 608, 610 (8th Cir. 2021) ("In deciding a motion to dismiss, courts ordinarily do not consider matters outside the pleadings.").

[9] United asserts that courts have repeatedly held that cancellation of an overpayment debt is a valid method of paying a claim under an ERISA plan. MTD at 14. None of the cases cited by United involve a cross-plan offset and all involve recoupment by offset of benefits otherwise due to the same participant who was previously overpaid. *Id*. at n. 7. More significantly, none of the cases were dismissed for lack of Article III standing; all were decided on the merits.

[10] These allegations, moreover, plausibly raise another cognizable injury, which Defendants do not even address in their brief: the informational injury the Plaintiffs experienced as a result of United's failure to inform them that their benefit payments were being offset to pay United's debts. United's failure to inform the Plaintiffs of the offset denied them their right to appeal as contractually promised in their respective plans (Compl. ¶¶ 49-50) and as is required by ERISA § 503, as set forth in 29 C.F.R. § 2560.503-1 (the "ERISA Claims Regulation"). *Id*. ¶¶ 72-73. Courts have long held that such

obtained an assignment to challenge the overpayment) and other participants whose claims were allegedly overpaid (who may not have an incentive to challenge the overpayment). United has, in effect, robbed Plaintiffs of their rights under ERISA to a full and fair claims review by making full payment of their approved benefits contingent on the actions of others. Even if Plaintiffs could have contested the overpayment decision that deprived them of their benefits, United could simply find another "overpayment" justifying an offset. As Judge Schiltz stated in *Peterson I*, in effectuating cross-plan offsets, United acts as "judge, jury and executioner." 242 F. Supp. 2d at 838.

History again provides ample support for recognizing the cloud United unilaterally placed on the "payments" it made on Plaintiffs' behalf—without so much as informing Plaintiffs about it—as concrete, particularized harm for Article III purposes. After all, these are injuries that arose because United, a fiduciary with complete discretionary control over Plaintiffs' plans' assets, breached its fiduciary duties to Plaintiffs when it decided to, and did, misdirect those assets through cross-plan offsets. Breach of fiduciary duty claims like these have deep historic roots in the common law; for centuries, courts have adjudicated alleged fiduciary breaches with "no further inquiry" into whether the breach caused any

---

"informational" injury can satisfy Article III. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998) (plaintiff voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III); *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989) (denial of information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). The Supreme Court reaffirmed the viability of this type of Article III injury in *Spokeo*, 578 U.S. at 342. *See also Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 419 (9th Cir. 2020) (injury based on "deprivation of information").

monetary loss. *See* Restatement (Third) of Trusts § 78(1) & cmt. b.[11] This long history confirms that Plaintiffs' non-monetary injuries are also cognizable under Article III.

**B.     Plaintiffs Plausibly Allege That United Breached its Fiduciary Duties.**

1.     Plaintiffs Plausibly Allege United Was Acting as a Fiduciary When it Took the Cross-Plan Offsets.

Under ERISA, an entity is a fiduciary with respect to a plan to the extent it "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). United admits it exercises discretion over "determinations concerning the amount to allow on [Plaintiffs'] claims" and that it is a fiduciary of the plans for that purpose. MTD at 22; *see also* Compl. ¶¶ 44-45. But United's discretionary authority and control over plan assets goes much further, as Plaintiffs allege. Compl. ¶¶ 43-61 (describing in detail the broad discretion United has in administering cross-plan offsets and the control United has over the plan assets used in effectuating the offsets). As set forth in the Complaint, United exercises discretion over every aspect of

---

[11] Under the "no further inquiry" rule, "a beneficiary is given a judgment against a wrongdoing trustee though the beneficiary has not suffered any damage and the trustee has not made any profit from the transaction." Bogert's Law of Trusts & Trustees § 862 (Update June 2020); *see also* 3 Austin Wakeman Scott et al., *Scott and Ascher on Trusts* § 17.2, at 1080 & n.13 (5th ed. 2007); *Keech v. Sandford,* (1726) 37; 25 Eng. Rep. 223 (Ch.); *Whelpdale v. Cookson,* (1747) 27 Eng. Rep. 856 (Ch.); *Aberdeen Ry. Co. v. Blaikie Bros.,* (1854) 2 L.R. Eq. 1281 (H.L.) 1286-1287 (summarizing cases); *Michoud v. Girod,* 45 U.S. (4 How.) 503, 556 (1846) (that rule has "been applied by the English courts of chancery from an early day" and adopted by American courts) (citing *Davoue v. Fanning,* 2 Johns. Ch. 252 (N.Y. Ch. 1816)); *Jackson v. Smith,* 254 U.S. 586, 588-589 (1921); *Magruder v. Drury,* 235 U.S. 106, 118-120 (1914); *United States v. Carter,* 217 U.S. 286, 307 (1910).

benefit approval, calculation, payment, and "recovery" of benefits on behalf of the plans it administers, *e.g.*, *id.* ¶¶ 45, 47, 48, 50, 54-55, 61, including:

> discretion to determine whether there has been any a prior overpayment, how much was overpaid, how much to demand in repayment, how to handle any appeals or challenges to a repayment demand, how much to accept as sufficient repayment, how any recoveries from purported overpayments are obtained, how much is recovered, or whether to even seek recovery of overpayments.

*Id.* ¶ 27. *See also id.* ¶ 5 (United "unilaterally decid[es] when to apply a cross-plan offset, the amount to offset, and which plan to take it from, and collects fees for doing so."); *id.* ¶ 49 (Plaintiffs' plans gave United discretion to quantify and recover overpayments made by Plaintiffs' plans, including by taking benefits payable under other plans); *id.* ¶ 52 ("Only United has the authority to cause an offset to be taken when administering claims under the Plaintiffs' Plans. Furthermore, United opens and maintains bank accounts for each plan, all of which are under United's sole control, and which United uses to make payments of benefits due under each plan. *Id.* ¶¶ 45, 46.

These allegations, which must be taken as true, inescapably demonstrate that United exercised discretionary authority and control over the disposition of the assets of multiple plans when it effectuated its Overpayment Bulk Recovery Process through cross-plan offsetting. As such, United was plainly acting as a fiduciary when it took the actions that are the subject of the Complaint. *See, e.g., McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016).

United's argument that the "action subject to complaint" is instead "the decision by plaintiffs' plans to employ cross-plan offsetting," MTD at 18, is entirely off base. The

24

Complaint does not assert claims against plans for any decisions they did or did not make—and United points to no such allegations or claims. Instead, the Complaint alleges that United automatically includes self-funded plans in its Bulk Recovery Process unless the plans affirmatively opt out. Compl. ¶ 36. The Plaintiffs' plans presumably did not opt out (a question of fact that parties will explore in discovery), but that hardly justifies the inference that the plans made any kind of intentional decision about whether to do so. Even if they did, the Complaint alleges that the plans affirmatively delegated to United complete discretion and control over when and how offsets would be taken, *e.g., id.* ¶¶ 43-61—and *those* actions are what this case is about. There is not a single allegation in the Complaint that suggests the plans played any role whatsoever in United's claims-processing decision, including about whether a cross-plan offset should be taken in any individual instance, including with respect to Plaintiffs' benefits. All the allegations say the opposite. *Id.* ¶ 27 ("The self-funded Plans [subject to cross-plan offsets] have no say or involvement in any of these discretionary acts."); *id.* ¶ 48 (United develops its reimbursement policy guidelines in its "sole discretion"); *id.* ¶ 52 ("No Plan has the information it would need to be able to offset an overpayment made to another Plan"); *id.* ¶ 61 ("There is no communication from United to the Plaintiffs' Plans prior to United pursuing a cross-plan offset. . . . [T]he entire process occurs without any input from or information to the Plans until after United has taken an offset.").

Nor do the allegations in the Complaint support the inference United urges, MTD at 18, that "independent plan officials—not United—controlled [the] decision" to permit cross-plan offsetting under their plan. To the contrary, the Complaint alleges that United

pressured plans not to opt out of the Bulk Recovery Process, Compl. ¶¶ 36, 40, and that United misled plan officials about the nature and scope of its cross-plan offsetting practice "by providing misinformation about the legal status of its process and misleading them about the litigation risks that accompany such a decision while failing to mention that engaging in the process results in violations of ERISA." *Id*. ¶ 41. The Complaint further details the misrepresentations United made to plan officials and United's failure to disclose the full extent of its self-interest in the cross-plan offsetting scheme. *Id*. ¶¶ 29-41. These allegations alone are sufficient to plausibly allege that United is a fiduciary. *See Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992) (holding that service providers were fiduciaries when they "exercised effective control" over plan fiduciaries by "us[ing] their position of trust and confidence to involve the [plan] in transactions in which they had a personal interest"); *Reich v. Lancaster*, 55 F.3d 1034, 1038-39 (5th Cir. 1995) (holding that a plan's consultant was a fiduciary because he "effectively exercised authority and control over management and administration of the plan" by "usurp[ing] the 'independent discretion' of plan trustees through 'misleading information' that led to their approval of [e]very recommendation" he made).[12]

---

[12] Even if this Court were to find (contrary to the allegations in the Complaint) that the decision to engage in cross-plan offsetting was controlled by plan officials, United still would not escape liability. As United concedes, it was a plan fiduciary for claims administration. MTD at 22. As a plan fiduciary, United was required to follow plan documents, but only to the extent they do not violate ERISA. *See* 29 U.S.C. § 1104(a)(1)(D); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) ("This provision makes clear that the duty of prudence trumps the instructions of a plan document. . . ."); *Central States, Se. & Sw. Area Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985) ("trust documents cannot excuse trustees from their duties under ERISA"); *Doe v. United Behav. Health*, 523 F. Supp. 3d 1119, 1127 (N.D. Cal. 2021) ("United Health

United's attempt to avoid fiduciary responsibility, notwithstanding all these allegations, is based on a misreading of Eighth Circuit caselaw. Under the Eighth Circuit's fiduciary test, a service provider is a fiduciary "if (1) it 'did not merely follow a specific contractual term set in an arm's length negotiation' and (2) it 'took a unilateral action respecting plan management or assets without the plan or its participants having an opportunity to reject its decision.'" *Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1073 (8th Cir. 2020) (quoting *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1212 (10th Cir. 2019)). *Rozo* expressly held that "a service provider may be a fiduciary when it exercises discretionary authority, even if the contract authorizes it to take the discretionary act." *Id.* at 1074 (citing *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986) ("When a contract . . . grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary")).

The cases on which United relies involved contracts that did not authorize the service provider to take discretionary actions or control plan assets; three of the cases United cites were expressly distinguished in *Rozo* as involving service provider acts that

---

cannot hide behind the plan terms, especially where ERISA imposes specific and independent duties on its fiduciaries to otherwise comply with the provisions of ERISA."). Whenever United determined to use self-funded plan assets to compensate itself for overpayments it made under its fully insured plans, it used plan assets in its own interest and for its own account, in violation of 29 U.S.C. § 1106(b)(1), and acted on both sides of a transaction involving assets of the plans, in violation of 29 U.S.C. § 1106(b)(2). United cannot avoid liability for engaging in these prohibited transactions simply because its own plan documents allowed it to do so; indeed, it had a fiduciary duty ***not*** to engage in cross-plan offsets even if ordered to do so by the Plan sponsors, because such offsets were prohibited transactions under ERISA.

were "contractually predetermined." 949 F.3d at 1074. *Rozo* noted that in *McCaffree Financial Corp. v. Principal Life Ins. Co.,* 811 F.3d 998 (8th Cir. 2016), the court found no fiduciary status in a case alleging excessive fees because "the contract between [the parties] ***clearly identified*** each separate account's management fee and authorized [defendant] to pass through additional operating expenses to participants in those accounts." *Id*. Similarly, in *Santomenno v. Transamerica Life Ins. Co*., 883 F.3d 833, 841 (9th Cir. 2018), the service provider was not a fiduciary because the case involved "withdrawal of *predetermined* fees." *Id.* And, in *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009), the service provider contract gave the plan sponsor the "final say" on investment options. *Id*. The remaining case cited by United, *Central Valley Ag Cooperative v. Leanard*, 986 F.3d 1082 (8th Cir. 2021), followed the *Rozo* test for service provider fiduciary status and concluded that the plan's service providers were not fiduciaries because the plan sponsor "retained possession and dominion over all plan assets at all times," and the service providers only had authority to issue checks in the precise amount approved by the plan fiduciary, and their compensation was authorized by contract. 986 F.3d at 1087-89.

Here, in sharp contrast, the contracts between United and the plans grant United complete discretion and authority: United administers its cross-plan offsetting program according to proprietary reimbursement policies and procedures, and plans give United complete control over assets used in the program. Compl. ¶¶ 44-45, 47-50, 55, 61. While United explains its proprietary cross-plan offsetting program in general terms in its Disclosures, as United argues (MTD at 19-20), the disclosed terms do not limit United's

discretion over how the program is administered. Compl. ¶¶ 32-34, 36. As the Complaint alleges in detail, United determines whether overpayments have been made *id.* ¶ 52, United decides whether to take an offset and for how much, *id.* ¶ 52, United decides from which plan the offset should be taken, *id.* ¶ 46, and United controls plan assets used in the offsets, *id.* ¶¶ 46-47. Moreover, the Disclosures state that offsets will only be taken where there has been an assignment of the plans' recovery rights for value, *id.* ¶ 35, suggesting that the plan must enter into a formal assignment before an offset can be effectuated when, in fact, there is no evidence that any formal assignment is made. *Id.* ¶ 51. Under the *Rozo* test, United is a fiduciary with respect to the actions challenged in the Complaint because the contracts give it discretion and no plan fiduciary or participant has the authority to reject a cross-plan offset.

  2. <u>Plaintiffs Plausibly Allege that the Cross-Plan Offsets Breached United's Fiduciary Duties.</u>

  United's half-hearted attempt to argue that the Complaint fails to state a claim for breach of fiduciary duty, MTD at 23-27, like its other arguments, has no merit.[13] As even United admits, MTD at 24, ERISA's duty of loyalty requires a fiduciary to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries" of the plan and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The Complaint alleges, at length, the ways in which United's cross-plan

---

[13] United frames this argument as though it is defending the "parties that made the fiduciary decision to use cross-plan offsetting," MTD at 23, but as explained above, the party solely responsible for the decisions *challenged in the Complaint* is United. *See* § IV.B.1, *supra*.

offsetting scheme benefits United at the expense of plan participants. *See* § II.C, *supra*. United's systematic misuse of plan benefits, treating the various plans it administers as its own personal piggybank and ignoring its fiduciary duties running to the plan participants, is a quintessential example of self-dealing by a disloyal fiduciary.

United's effort to recast its self-serving scheme as somehow serving the *plans*' or *plan participants'* interests, MTD at 24, besides being based on facts *not* alleged in the Complaint and therefore not properly considered here, is specious. To see why, the Court need only consider offsets from the point of view of the *Plan B* participants, like the Plaintiffs here. United took their benefits and used them to repay *itself* to cover up for its own mistakes in administering other plans. Compl. ¶¶ 2-4, 7, 12, 26, 40-42, 62-65, 84, 88, 92, 95. Plaintiffs had no interest in ensuring other people's plans, let alone United itself, recovered overpayments United made. Even if cross-plan offsetting ensures Plan As are repaid, the practice is decidedly *contrary* to the interests of Plan B participants.

United owes separate and distinct fiduciary duties to each self-funded plan, as each plan is a discrete entity that serves only the interests of its own participants and beneficiaries. As a fiduciary for each plan, United must act "solely in the interest of the participants and beneficiaries" of that plan, and "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). United is prohibited from dealing with plan assets in its own interests, 29 U.S.C. § 1104(B)(1), and from representing both sides of a transaction between a plan and a third party, even if the third party is another plan to which United serves as a fiduciary. 29 U.S.C. § 1106(B)(2). United is also prohibited from

causing a plan to transfer plan assets to any party in interest, which includes itself as a fiduciary and service provider to the plan, or to pay itself unreasonable compensation. 29 U.S.C. § 1106(a)(1)(C) and (D); 29 U.S.C. § 1002(14). United is also required to give participants and beneficiaries a full and fair review of benefit claims in accordance with Department of Labor regulations. 29 U.S.C. § 1133.

United's scheme also violated its fiduciary duties of care and prudence because cross-plan offsets are prohibited transactions that violate ERISA. *See*, *e.g.*, *Dudenhoeffer*, 573 U.S. at 421 (29 U.S.C. § 1104(a)(1)(D) "makes clear that the duty of prudence [in § 1104(a)(1)(B)] trumps the instructions of a plan document. . . . ."). ERISA prohibits fiduciaries from dealing with plan assets in their own interest and for their own account, 29 U.S.C. § 1106(b)(1); from acting on both sides of transactions between plans and parties whose interests are adverse, *id.* § 1106(b)(2); and from causing plans to engage in transactions that transfer plan assets to the fiduciary. *Id*. §§ 1106(a)(1)(C) & (D). Plaintiffs plausibly allege that United's cross-plan offsets ran afoul of each of those prohibitions. The allegations explain at length how, in effectuating cross-plan offsets, United misuses Plan B assets (which are supposed to be paid as benefits to Plan B participants) to serve its own interests and pad its own account. Compl. ¶¶ 2-4, 7, 12, 26, 40-42, 62-65, 84, 88, 92, 95. The allegations show how United acts on both sides of cross-plan offsets, even though the Plan Bs and their participants have interests adverse to the interests of the Plan As. *Id.* ¶¶ 5, 7, 26, 33-34, 84, 92, 95. And the allegations clearly demonstrate that a key feature of United's scheme is to use cross-plan offsets to transfer Plan B assets into its own account. *Id*. ¶¶ 2-4, 7, 12, 33, 62-65, 87, 92, 95.

There can be no question that Plaintiffs' allegations against United plausibly state fiduciary breach claims under ERISA. While these claims were not directly before the court in *Peterson I*, both this Court and the Eighth Circuit called the legality of United's cross-plan offsetting into question, concluding that the plan documents could not be read to authorize the practice. This Court stated in *Peterson I* that "[i]t is fairly debatable whether cross-plan offsetting is ever permissible under ERISA," but "[i]t is not fairly debatable. . . that the type of cross-plan offsetting challenged in this case—that is, cross plan offsetting engaged in by an administrator who insures some (but not all) of the plans—presents a grave conflict of interest." *Peterson I* at 845. Similarly, in upholding the decision on appeal, the Eighth Circuit noted that although it did not need to decide in that case "whether cross-plan offsetting violates ERISA, at the very least it approaches the line of what is permissible," warning United that "[r]egardless of whether cross-plan offsetting necessarily violates ERISA, it is questionable at the very least." *Peterson on behalf of E v. UnitedHealth Grp. Inc.*, 913 F.3d 769, 777 (8th Cir. 2019) ("*Peterson II*") at 776. A later district court, faced with the direct question whether cross-plan offsets violate ERISA, held that "even if [the plans] permit cross-plan offsetting, they cannot circumvent ERISA requirements" and "cross-plan offsetting is prohibited by ERISA." *Lutz Surgical Partners PLLC v. Aetna, Inc.*, No. 3:15-cv-02595(BRM)(TJB), 2021 WL 2549343, at *18 (D.N.J. June 21, 2021) (holding that Aetna's practice of cross-plan offsetting between self-funded plans violated Section 406(b)(2) of ERISA, 29 U.S.C. § 1106(b)(2)).

Significantly, the Secretary of Labor, which is the sole regulator for self-funded ERISA plans, explicitly concluded in its amicus brief in *Peterson II* that cross-plan offsets

are inherently illegal under ERISA.[14] As the Secretary explained, "United's practice of cross-plan offsetting violated United's fiduciary duties under ERISA to act exclusively in the plan participant's interest and to provide participants their plan benefits and was self-dealing under ERISA." As the Secretary further explained, "these transactions were structured by United to allow United to profit by recouping its own alleged overpayments from its fully insured plans that are funded through its own accounts with payments from self-funded plans that are funded by plan sponsors and their employees." *Peterson v. UnitedHealth Grp.*, 2017 WL 3994970, **6-7, 8 (8th Cir. Sept. 7, 2017) (Brief for the Secretary of Labor as Amicus Curiae in Support of Plaintiffs-Appellees).

None of the arguments and authorities relied upon by United help it escape its fiduciary liability. There is no statutory exemption for cross-plan offsetting in ERISA and United has not sought an individual or class exemption from the Department of Labor, which would require it to show that the practice is not only in the interest of the plans, but also in the interest and protective of the rights of participants and beneficiaries. *See* 29 U.S.C. § 1108(a) and (b); *see also* Compl. ¶¶ 38-39. [15]

---

[14] In light of the DOL's position in *Peterson II*, United's suggestion that the DOL favors cross-plan offsetting as a "cooperative arrangement between plans" is particularly misplaced. MTD at 24. Nor do the regulations and guidance on which United relies, *id.*, even address cross-plan offsetting.

[15] It is, of course, a factual question whether cross-plan offsetting benefits self-funded plans or hurts them, but that question is not even on the table when the allegations are that cross-plan offsetting violates ERISA's stringent prohibited transaction provisions and constitutes self-dealing.

Surprisingly, United points to various Department of Labor advisory opinions and a class exemption to suggest that cross-plan offsetting is simply a "cooperative arrangement between plans, where the arrangement entitles each plan to reciprocal and proportional benefits." MTD at 24. However, if the Department of Labor thought cross-plan offsetting fell within this category of arrangements, it would undoubtedly have said so in its *amicus* brief in *Peterson II*, in which it relied on other advisory opinions to argue that cross-plan offsetting violates ERISA. *See* 2017 WL 3994970 at *16 (citing Op. No. 77-34 and Op. No. 81-62A); *see also Office of Pension and Welfare Benefit Programs (E.R.I.S.A.)* Op. No. 77-34, 1977 WL 5397, *4 (Apr. 4, 1977) (finding that an ERISA fiduciary could not reduce benefits under one plan to remedy a participant's failure to repay overpayments under a sister plan because "problems relating to another plan have no relevance to the plan in question."); *Office of Pension and Welfare Benefit Programs (E.R.I.S.A.)* Op. No. 81-62A, 1981 WL 17785, *3 (July 21, 1981) (cautioning that if assets of multiple plans are commingled, careful accounting is required to "avoid using the assets of one such plan to pay benefits to participants and beneficiaries of another such plan."). United, unlike the parties seeking the class exemption that it cites, has not gone through the rigorous process necessary to obtain the class exemption from the Department of Labor. And, as evidenced by the Plaintiffs' experiences, it is highly unlikely that United could show that cross-plan offsetting is in the interest and protective of participants and beneficiaries of the plans as required by 29 U.S.C. § 1108(a).

Reviewing the four advisory opinions from 1980 to 1993 United relies upon in its motion to dismiss is similarly unhelpful because none address cross-plan offsetting, instead

setting forth extensive facts about the structure of the arrangements and protections designed to avoid self-dealing in circumstances which are not present here.

## V. <u>CONCLUSION</u>

For all of these reasons, United's Motion to Dismiss should be denied.

Dated: November 23, 2022                    Respectfully submitted,

                                            *s/ Kristen G. Marttila*
                                            Karen H. Riebel, Esq. (MN #0219770)
                                            Kristen G. Marttila, Esq. (MN #0346007)
                                            Derek C. Waller, Esq. (MN #0401120)
                                            LOCKRIDGE GRINDAL NAUEN, P.L.L.P
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Tel. (612) 339-6900
                                            khriebel@locklaw.com
                                            kgmarttila@locklaw.com
                                            dcwaller@locklaw.com

                                            E. Michelle Drake, Esq. (MN #0387366)
                                            BERGER MONTAGUE PC
                                            1229 Tyler Street NE, Suite 205
                                            Minneapolis, MN 55413
                                            Tel. (612) 594-5999
                                            Fax. (612) 584-4470
                                            emdrake@bm.net

                                            Karen L. Handorf, Esq. (pro hac vice)
                                            Julie S. Selesnick, Esq. (pro hac vice)
                                            BERGER MONTAGUE PC
                                            2001 Pennsylvania Ave., NW, Suite 300
                                            Washington, D.C. 20006
                                            Tel. (202) 559-9740
                                            Fax (215) 875-4604
                                            khandorf@bm.net
                                            jselesnick@bm.net

                                            D. Brian Hufford, Esq. (pro hac vice)
                                            Jason S. Cowart, Esq. (pro hac vice)
                                            ZUCKERMAN SPAEDER LLP
                                            485 Madison Avenue, 10th floor
                                            New York, NY 10022
                                            Tel. (212) 704-9660
                                            Fax (212) 704-4256
                                            dbhufford@zuckerman.com
                                            jcowart@zuckerman.com

                                            *Counsel for Plaintiffs*