# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| REBECCA SMITH AND CRISTINE M. GHANIM, individually and on behalf of all others similarly situated, | Case No. 22-CV-1658 (NEB/DJF) |
| Plaintiffs, | ORDER ON MOTION TO DISMISS |
| v. | |
| UNITEDHEALTH GROUP INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, UNITED MEDICAL RESOURCES, UNITED HEALTHCARE SERVICE LLC, and DOE DEFENDANTS 1–10, | |
| Defendants. | |

Plaintiffs Rebecca Smith and Cristine Ghanim participate in employer-sponsored health-insurance plans administered by UnitedHealth Group Inc. and the other above-captioned defendants (collectively, "United"). They bring this putative class action alleging that United's practice of "cross-plan offsetting" violates the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. United moves to dismiss for lack of jurisdiction and failure to state a claim. For the reasons below, the Court grants the motion on Article III standing grounds.

## BACKGROUND

The Court presents the facts in the light most favorable to the non-moving party. United insures and administers health-insurance plans governed by ERISA. (ECF No. 35 ("Compl.") ¶ 1[1].) It administers two types of plans: "fully insured" and "self-funded." (*Id.*) In a fully-insured plan, United pays for covered healthcare expenses out of its own pockets. (*Id.*) In a self-funded plan, the plan itself pays for covered expenses, which come from payroll contributions by the plan's participants and contributions by the plan's sponsor. (*Id.*) Under each type of plan, United accepts and processes benefits claims, determines whether a provider's services are covered, and pays providers for claims on behalf of participants and beneficiaries. (*Id.*)

At issue here is United's practice of cross-plan offsetting. As one of the largest health-insurance companies in the world, United administers a massive volume of claims. Not surprisingly given the volume, it makes some mistakes. The mistake relevant here is when United pays a provider more than they are owed under a health-insurance plan. The solution: cross-plan offsetting.[2] (*Id.* ¶ 30.) A court in this district, faced with a challenge to cross-plan offsetting several years ago, summarized the procedure as follows:

> Suppose that a patient named Andy is insured under a health plan administered by United. Andy sees Dr. Peterson for treatment of a sore

---

[1] All pincites are to the ECF pagination, not native pagination.

[2] United refers to cross-plan offsetting as its "Bulk Recovery Process." (Compl. ¶ 30.)

neck. Dr. Peterson submits his bill to United. United pays $350 to Dr. Peterson. Later, however, United discovers that it should have paid only $200 to Dr. Peterson. United contacts Dr. Peterson, brings the overpayment to his attention, and asks him to return $150.

If Dr. Peterson agrees that he was overpaid and returns the $150, the problem is solved. But if Dr. Peterson does not agree that he was overpaid and refuses to return the money, United has limited options for getting back its $150. In theory, United could initiate administrative or legal proceedings against Dr. Peterson. As a practical matter, however, United is unlikely to do so, as United would spend far more than $150 in pursuing the $150 overpayment.

Another option might be to engage in same-plan offsetting. Under this approach, United would wait until Andy or anyone else covered by Andy's health plan is treated by Dr. Peterson. When Dr. Peterson submits a bill to United on behalf of that patient, United would deduct $150 from the payment that it would otherwise make to Dr. Peterson. From United's perspective, however, same-plan offsetting presents a big problem: Dr. Peterson may never again treat Andy or someone who is insured under Andy's plan. Dr. Peterson practices in New York City, a giant metropolitan area. Andy may work for a small company in a distant suburb, and he may be insured under a company-sponsored plan that covers only Andy and 20 other employees. The chances may be slim that Dr. Peterson will ever again treat someone who is insured under Andy's plan. And thus, United may never have the opportunity to use same-plan offsetting to recoup its $150 overpayment from Dr. Peterson.

To get around this problem, United adopted the practice of cross-plan offsetting. Under this approach, United merely has to wait until anyone covered by any of the thousands of plans that it administers sees Dr. Peterson. Suppose, for example, that two weeks after treating Andy, Dr. Peterson treats Betsy, who is injured while on vacation in New York City. Suppose further that Betsy is insured under a plan that is administered by United and that covers Betsy and 50 of her co-employees (all of whom live in San Diego). When Dr. Peterson submits a bill to United on behalf of Betsy, United would deduct $150 from the payment that Betsy's plan would otherwise make to Dr. Peterson and thereby recoup the overpayment that Andy's plan made to Dr. Peterson in connection with his treatment of Andy.

*Peterson ex rel. Patients E, I, K, L, N, P, Q, & R v. UnitedHealth Grp., Inc.*, 242 F. Supp. 3d 834, 837 (D. Minn. 2017), *aff'd sub nom. Peterson ex rel. E v. UnitedHealth Grp., Inc.*, 913 F.3d 769 (8th Cir. 2019).

Plaintiffs allege that cross-plan offsetting "directly benefit[s] United to the detriment of self-funded Plans, particularly when self-funded Plan assets are transferred to United to reimburse United for overpayments it retroactively concludes it had made from its own fully insured Plans." (Compl. ¶ 2.) United is the "big winner," the argument goes, because 40-50% of the funds recovered by United are taken from self-funded plans (consisting of plan and plan participants' money) and transferred to United to reimburse overpayments made by fully-insured plans (United's money). (*Id.* ¶ 3.) In 2019, United recouped $599 million for overpayments made by fully-insured plans. (*Id.*) In 2020, that number was $405 million. (*Id.*) As icing on the cake, United also collects "millions of dollars" in fees when it recoups overpayments on behalf of self-insured plans, withholding a portion of the overpayments before returning the funds. (*Id.* ¶ 4.)

As mentioned, this is not the first challenge to United's practice of cross-plan offsetting. Responding to the challenge in *Peterson*, the court commented that it is "not fairly debatable" that cross-plan offsetting between self-funded and fully-insured plans "presents a grave conflict of interest." 242 F. Supp. 3d at 845. On appeal, the Eighth Circuit agreed, adding that cross-plan offsetting "approaches the line of what is permissible" under ERISA, stating that it is "questionable at the very least." 913 F.3d at 776–77. But the

broad question of the legality of cross-plan offsetting was not at issue in *Peterson*. *Id.* at 775. The courts decided a narrower issue—whether then-existing plan documents authorized United to engage in cross-plan offsetting in the first place. *Id.*

After *Peterson*, in an attempt to solve that issue, United added language to its plan documents to permit cross-plan offsetting expressly. (Compl. ¶ 10.) It included authorizing language in the summary descriptions that it sends to self-funded plans, requiring plans to opt out of participating in the process (instead of opting in). (*Id.*) United also confirmed its "systemic" cross-plan-offsetting policy in an August 2021 notice ("Notice") sent to its self-funded clients, (*id.* ¶ 32), explaining its practice as follows:

> Once overpayments are identified, UnitedHealthcare starts by offering medical providers who may have received overpayments the opportunity to dispute and/or voluntarily refund the overpayments. If providers choose not to dispute the overpayments or UnitedHealthcare determines that the providers' disputes are not valid, UnitedHealthcare uses the Bulk Recovery Process to collect the receivables due against current or future payments to the overpaid providers under any plan that UnitedHealthcare administers. The recovered amount is then credited to the plan that overpaid. The Bulk Recovery Process allows UnitedHealthcare plans—both self-funded and fully insured—to efficiently recover overpayments made to providers by clearly identifying the claims being paid and the funds being recovered within a single payment instrument on behalf of all employer groups serviced by United Healthcare.

(*Id.* ¶ 33.) United stated that self-funded plans are "automatically" enrolled in the cross-plan-offsetting program and may opt out, but it warned against doing so because the plan would be able to recover only select overpayments. (*Id.* ¶ 36.)

The Notice also commented on the legality of cross-plan offsetting. United explained that the courts' rulings in *Peterson* (the District Court and Eighth Circuit) required express authorizing language in plan documents permitting cross-plan offsetting, and further explained that neither court held cross-plan offsetting unlawful. (*Id.* ¶ 37.) United also promised to "assist with any litigation stemming from the plan's participation in the Bulk Recovery Process," and it asserted that the "plan language UnitedHealthcare has provided expressly authorizing the Bulk Recovery Program has been drafted to minimize this risk." (*Id.* ¶ 40.)

Plaintiffs Smith and Ghanim are participants in self-funded plans administered by United. (*Id.* ¶¶ 14–15.) Smith is in the Jacobs Engineering Group Medical Plan, a self-funded plan sponsored by her husband's employer. (*Id.* ¶ 14.) Smith and her husband pay $145 every two weeks for their insurance. (*Id.*) Ghanim is a participant in the Finance of America Companies High Plan (together with Smith's plan, the "Plans"). Ghanim and her employer share in the cost of her plan, including the fees they pay to United to serve as the plan's administrator. (*Id.* ¶ 15.) Both Plans expressly give United authority to engage in cross-plan offsetting:

> Payment of Benefits under the Plan shall be in cash or cash equivalents, or in the form of other consideration that UnitedHealthcare in its discretion determines to be adequate. Where Benefits are payable directly to a provider, such adequate consideration includes the forgiveness in whole or in part of amounts the provider owes to other plans for which UnitedHealthcare makes payments, where the Plan has taken an assignment of the other plans' recovery rights for value.

(*Id.* ¶ 50.) The Plans also give United discretion to determine if, when, and by how much United overpaid a provider, as well as a right to recover the excess amount. (*Id.* ¶ 49.)

United's authority is subject only to an internal appeals procedure. Plan participants, providers, or authorized representatives may appeal United's coverage determinations. (ECF No. 28-1 at 41.) In the event of an appeal, United decides whether to uphold the coverage denial and it issues a written explanation why. (Compl. ¶ 59.)

Smith and Ghanim each underwent medical procedures in recent years. United covered their claims and paid their providers using cross-plan offsets. (*See id.* ¶¶ 82, 90, 95; ECF No. 49 ("Opp.") at 20 (admitting that Plaintiffs "received medical services that were covered under her plan and *approved* by United" (emphasis in original)).) Smith received spinal surgery at Sierra Center of Viera ("SCV") in November 2020. (Compl. ¶ 75.) After some negotiation, United confirmed that it owed $42,082.13 to SCV for the surgery. (*Id.* ¶ 82.) United paid $39,458.99 in cash. (*Id.*) On the remaining $2,623.14, United applied an offset. (*Id.* ¶ 85.) United claimed that it had overpaid SCV for services performed by SCV for a different patient in a different, fully-insured health-insurance plan. (*Id.* ¶ 84.) SCV owed the other plan $2,623.14 for the previous overpayment, so United withheld that amount from its payment to SCV for Smith's services. (*Id.* ¶ 85.)

As for Ghanim, she received various treatments at the Center for Pain and Rehabilitation Medicine in San Jose, California in July, August, September, and November 2020. (*Id.* ¶¶ 89, 95.) On the first of two bills, United determined that it owed

Ghanim's provider $8,015.99, but it withheld the entire amount to offset a previous overpayment made by United to the Center for services to a different patient. (*Id.* ¶¶ 91–92.) As before, the other patient was enrolled in a fully-insured plan. (*Id.* ¶¶ 91–92.) On the second bill, United owed the provider $5,892.25. (*Id.* ¶ 95.) It paid $2,949.31 in cash and offset the remaining $2,942.94. (*Id.*)

Stories like these are common in cross-plan offsetting. Plaintiffs allege that United has taken "hundreds of millions of dollars" in cross-plan offsets in a process identical to the one applied here. (*Id.* ¶ 96.) Plaintiffs accordingly bring their claims on behalf of a putative class under Rule 23 of the Federal Rules of Civil Procedure. They define the class as follows:

> All persons in the United States who were covered under an ERISA self-funded plan administered by United, who had at least one claim processed by United with a benefit amount identified that was due and owing to a non-Network provider whose claims were not paid in full by United because United withheld it and applied some portion of the covered amount toward an alleged overpayment by a different plan.

(*Id.* ¶ 97.) By employing cross-plan offsetting, Plaintiffs contend that United breached the fiduciary duties it owes to Plaintiffs and the class under ERISA as the administrators of the Plans. (*Id.* ¶ 7.)

Plaintiffs bring five claims under ERISA.[3] United moves to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, claiming that

---

[3] (1) Breach of the duty of loyalty by using self-funded plan assets for non-plan purposes, in violation of 29 U.S.C. Section 1104(a) (*Id.* ¶¶ 107–13); (2) self-dealing by using the plan

Plaintiffs lack standing because they have not suffered a constitutional injury. (ECF No. 41.) United also moves to dismiss for failure to state a plausible claim under Rule 12(b)(6). Because the Court determines that the Plaintiffs lack constitutional standing, it does not reach the Rule 12(b)(6) motion.

## ANALYSIS

When deciding a Rule 12(b)(1) jurisdictional challenge, courts "must distinguish between a facial attack and a factual attack." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quotation marks and citations omitted). Under a facial attack, a court must limit itself to the face of the pleadings, and the non-moving party receives the same protections it would defending a motion to dismiss under Rule 12(b)(6). *Id.* Under a factual attack, courts consider matters outside the pleadings, and the non-moving party has no right to Rule 12(b)(6)'s protections. *Id.*

United does not state whether it brings a facial or factual attack to the Court's jurisdiction. It does not matter, however, because it is clear from the face of the complaint that Plaintiffs lack standing, so the Court applies the standard for reviewing motions under Rule 12(b)(6). It asks whether the complaint has alleged enough facts, accepted as

---

assets for its own interest, violating 29 U.S.C. Section 1106(b)(1) (*Id.* ¶¶ 114–18); (3) representation of multiple plans, running afoul of Section 1106(b)(2) (*Id.* ¶¶ 119–24); (4) use of self-funded plan assets for its own interests, in violation of Section 1106(a)(1)(C) and (D) (*Id.* ¶¶ 125–31); and (5) failure to provide timely and adequate notice and a full and fair review of benefits denials, violating 29 U.S.C. Section 1133. (*Id.* ¶¶ 132–37.) Plaintiffs seek declaratory, monetary, and injunctive relief. (*Id.* ¶ 138.)

true with all reasonable inferences drawn in Plaintiffs' favor, to state a plausible claim to relief. *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). In making that determination, the Court considers documents outside the pleadings only if they are "necessarily embraced" by the complaint. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted).

Article III limits the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation marks and citation omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs, the party invoking the Court's jurisdiction, bear the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

United contests only the first requirement, (ECF No. 43 ("Mot.") at 16), so the Court focuses its inquiry on whether Plaintiffs have properly pleaded an injury in fact. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560).

Plaintiffs assert three theories of harm.[4] First, they contend that United underpaid or failed to pay their approved Plan benefits. (Opp. at 20.) Second, they argue that cross-plan offsetting injures them today because of an increased risk their providers will bill or sue them in the future. (*Id.* at 24.) Third, they assert that they suffered an informational injury because United did not properly notify them that it was applying the offsets. (*Id.* at 28 n.10.) The Court addresses each theory in turn.

## I.    Failure to Pay Approved Benefits

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. "For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion*, 141 S. Ct. at 2205. Put simply, "an injury in law is not an injury in fact." *Id.* These injury requirements extend to

---

[4] Three of Plaintiffs' claims are premised in part on United's collection of fees from self-funded plans for recouping past overpayments. (Compl. ¶¶ 111, 116, 128.) Plaintiffs do not argue the fees are an injury for Article III standing purposes. Had they done so, the argument would fail because Plaintiffs do not allege that their Plans were charged any recovery fees. (*Compare id.* ¶¶ 75–95 (not mentioning any recovery fees charged to the Plans), *with id.* ¶ 98 (bringing a class action "on behalf of the Class's Plans for losses to the Class's Plans caused by United's cross-plan offsets *and fees* taken in connection with cross-plan offsets (emphasis added).) Also, as discussed below, injuries to a *plan* do not necessarily harm a plan's *participants* for purposes of conferring constitutional standing. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1620 (2020).

ERISA, as "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

In *Thole*, participants in a defined-benefit retirement plan sued U.S. Bank and others for mismanagement of their retirement plan's assets. *Id.* at 1618. Under a defined-benefit plan, participants receive a fixed monthly pension payment no matter how well their plan performs financially. *Id.* The Supreme Court held that the plaintiffs lacked standing because the "outcome of th[e] suit would not affect their future benefit payments." *Id.* at 1619. Whether they won or lost the case, the plaintiffs would still receive the benefits that they were entitled to receive. *Id.* at 1619. In other words, even if U.S. Bank violated ERISA, the retirees sustained no monetary injury and were therefore without standing, having received all their vested pension benefits. *Id.* at 1618–19. The Court also rejected Plaintiffs' argument that an injury to a *plan* necessarily harms the plan's *participants*, explaining that defined-benefit plan participants do not have an equitable or property interest in the plans themselves. *Id.* at 1620.

The year after *Thole*, in another predecessor to this case, participants in employer-sponsored group health plans brought a putative class action under ERISA against UnitedHealth Group and others. *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 859 (D. Minn. 2021). As here, the plaintiffs challenged United's practice of cross-plan offsetting. *Id.* A court in this district concluded that the plaintiffs lacked constitutional standing because they had alleged that United's ERISA violations "caused injury to the

*plan*—and not injury to *plaintiffs themselves*." *Id.* at 861 (emphasis in original). The plaintiffs did not allege that they were denied benefits to which they were entitled, nor that they had submitted claims that were wrongfully denied. *Id.* at 862. They argued instead that they experienced a pocketbook injury when United mismanaged their payroll contributions by applying cross-plan offsets. *Id.* The court reasoned that payroll contributions are *plan* assets, not plan *participants'* assets, so *Thole* controlled the outcome. *Id.* The plaintiffs in *Scott* did not base their theory of injury on cross-plan offsetting amounting to a "denial of benefits," nor did they allege that they were subject to cross-plan offsetting. *Id.* at 864.

Plaintiffs here pick up where their peers in *Scott* left off. As their first theory of harm, they argue that United did not pay their approved Plan benefits when it applied the cross-plan offsets. In other words, they allege that payment by offset is not the same as payment by cash, such that there is a benefit denial. Those denials, Plaintiffs assert, are injuries to them personally—not the Plans. And Plaintiffs insist that the "loss of money" they have incurred is concrete harm that qualifies as an injury in fact. (Opp. at 21.)

An interesting initial matter: Plaintiffs press that the Court must accept as true their assertion that United denied them benefits promised under the Plans. (*Id.* at 23.) That assertion misstates the law. Of course, on a motion to dismiss, the Court must credit all factual allegations in the complaint. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). But the Court is not required to accept "legal conclusions couched as factual

allegations." *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015). The determination that using an offset rather than a cash payment is a "denial of benefits" is a conclusion of law, not a factual assertion. All told, based on the facts Plaintiffs have alleged, they have not plausibly pleaded that United denied them a contractually-guaranteed benefit under the Plans.

Several facts frame the Court's conclusion. The Plans expressly permit cross-plan offsetting. (Compl. ¶¶ 10, 30–31, 37, 50.) United paid Plaintiffs' providers through some combination of cash and offsets. (*Id.* ¶¶ 83–86, 91–93, 95.) It also sent each provider a Provider Remittance Advice, which showed full payment by United along with United's use of debt cancellation to pay some or all of the balances. (*Id.*) Fast-forward two years, and neither provider has ever sought a cash payment from Plaintiffs for the offset amount, which is known as "balance billing." Smith's provider signed an agreement *not* to balance-bill her patients. (*Id.* ¶ 78.) What is more, hundreds of millions of dollars in debts have been cancelled by United through cross-plan offsets, (*id.* ¶ 3), but Plaintiffs have not identified a single instance of any provider ever balance-billing a patient. Lastly, Plaintiffs are not bringing a denial-of-benefits claim under Section 1132(a)(1)(B), even though their first theory of harm is loss of money from United's failure to pay benefits.

It is of course true that pocketbook injuries "readily qualify" as concrete for Article III standing purposes. *TransUnion*, 141 S. Ct. at 2204. But Plaintiffs have not experienced a pocketbook injury—they have experienced no financial harm. They allege that

"United—as the administrator of Plaintiffs' Plans—took assets from those Plans and put those funds into its own pocket, thereby benefitting itself at the expense of the Plans and Plaintiffs." (Compl. ¶ 12.) But had United not engaged in cross-plan offsetting, Plaintiffs would be out-of-pocket the same amount they are now. Just as in *Thole*, Plaintiffs received exactly what they signed up to receive: they each paid to obtain coverage under their employers' self-insured Plans, which were administered by United, (*id.* ¶¶ 14–15); United elected to cover Plaintiffs' healthcare services, (*id.* ¶¶ 81, 90; *see also* Opp. at 20 (admitting that Plaintiffs "received medical services that were covered under her plan and *approved* by United" (emphasis in original))); and then United paid the providers for those services with debt cancellation or a mix of cash and debt cancellation. (*See* Compl. ¶¶ 82, 91.)

Plaintiffs caution that by accepting the premise that Plaintiffs have received the benefits they were entitled to receive, the Court is "simply assuming [United] already won the case on the merits." (Opp. at 24.) Not so. Even if United violated ERISA by engaging in cross-plan offsetting, "Article III standing requires a concrete injury *even in the context of a statutory violation*." *TransUnion*, 141 S. Ct. at 2205 (emphasis added) (citation omitted). Plaintiffs need to show that they were injured by the cross-plan offsets, even if United breached its fiduciary duties when it employed them.

Plaintiffs have not met their burden. The Court recognizes that Plaintiffs *allege* that Smith and Ghanim suffered financial losses in the amounts of $2,623.14 and $10,958.93,

respectively—the value of the cross-plan offsets.[5] (Compl. ¶¶ 82, 91, 95.) But these are not losses to either Smith or Ghanim. United may not have paid the providers in cash, but it did pay them when it cancelled debts the providers owed to other plans administered by United. That form of consideration is permitted under the Plans. (*Id.* ¶ 50.) Plaintiffs would have undeniably experienced a concrete harm if their providers had balance-billed them for the offsets. But again, neither provider has done so or threatened to do so. At bottom, Plaintiffs may take issue theoretically with United's means of consideration and its legality under ERISA. But based on the facts Plaintiffs have alleged, they have not articulated an experienced financial harm that confers an injury in fact.

## II.     Increased Risk of Harm

Plaintiffs' second injury theory is that they are harmed today by an increased risk that their providers will bill or sue them in the future. (Opp. at 24.) But Plaintiffs do not allege that their providers are likely to bill them. Nor do they identify *any* provider that has ever balance-billed a patient for an offset under *any* healthcare plan administered by United. Those omissions are fatal to Plaintiffs' second argument for standing.

Plaintiffs' risk-of-harm theory traces back to *Scott*. At the hearing in that case, Chief Judge Patrick J. Schiltz opined on how a hypothetical plan participant might establish

---

[5] The complaint alleges that United underpaid Ghanim's provider twice. United first withheld $8,015.99 in offsets for services the provider performed in August 2020 and September 2021. (Compl. ¶¶ 89, 91.) United then withheld $2,942.94 for services in July, September, and November 2020. (*Id.* ¶ 95.) Plaintiffs calculate the total offset amount at $10,958.82, but it is $10,958.93. (*Id.*)

constitutional standing to challenge cross-plan offsetting. *Scott*, No. 20-CV-1570 (PJS/BRT), ECF No. 66 (D. Minn. Jan. 28, 2021). Chief Judge Schiltz keyed into a denial of benefits from the risk of balance-billing. *Id.* at 8, 12, 16. As here, the hypothetical plaintiff would have visited an out-of-network provider and had a contractual right to be reimbursed in some amount by United. *Id.* at 8, 11–12. United would purportedly cancel the provider's debt through cross-plan offsetting. *Id.* at 8, 12. The provider, however, must not have owed debt to United, or at least contested the debt. *Id.* Under these facts, the court reasoned, United would have effectively paid nothing, and the plaintiff would have been denied benefits because she was at risk of balance-billing. *Id.* at 8–9, 12. Crucial to Chief Judge Schiltz's hypothetical was a provider who was likely to balance-bill the patient. *Id.* at 9, 12; *see also id.* at 16 ("You'd have to find a provider like Dr. Peterson who disputed that he had any debt that was cancelled, who would have to go to the patients and have to basically threaten the patient with balance billing . . . ."). A threat of balance-billing never happened here, and intervening caselaw makes that distinction dispositive.

A month after *Scott* was decided, the Supreme Court issued *TransUnion*. The Court dismissed in part a putative class action for lack of standing. 141 S. Ct. at 2212. The class consisted of people whose credit reports mistakenly labeled them as potential terrorists. *Id.* at 2202. Relevant here, for many class members, TransUnion had not yet shared any mistaken information with future creditors. *Id.* at 2209. The plaintiffs argued that they suffered a concrete harm because their inaccurate credit files increased their risk of injury.

*Id.* at 2210–11. But the Court held that future injury must materialize to create standing to sue for damages, unlike injunctive relief. *Id.* at 2211. The Court explained, "the plaintiffs did not factually establish a sufficient risk of future harm to support Article III standing." *Id.* at 2212.

The *TransUnion* Court also addressed injunctive relief, holding that "a person exposed to a risk of future harm" has constitutional standing "to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 2210; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (holding that future harm must be "certainly impending"). By contrast, if a plaintiff is pursuing damages, the risk of harm must have "materialized" for it to be concrete. *TransUnion*, 141 S. Ct. at 2211; *see also Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 938 (7th Cir. 2022) ("A plaintiff seeking money damages has standing to sue in federal court only for harms that have in fact materialized.").

Plaintiffs seek both damages and an injunction, and they "must 'demonstrate standing separately for each form of relief sought.'" *TransUnion*, 141 S. Ct. at 2210 (citing *Friends of the Earth, Inc. v. Laidlaw Evn't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). For their damages claim, as in *TransUnion*, harm has not yet materialized. Plaintiffs do not allege that their providers have balance-billed them for the cross-plan offsets. They argue instead that the "uncertain status" of those offsets has created a risk that the providers might bill them in the future. (Opp. at 25.) *TransUnion* forecloses that injury theory. The

18

question, then, is whether Plaintiffs have alleged enough facts in support of an injury for injunctive relief. Put another way, do Plaintiffs plausibly allege that the harm from a future balance bill is certainly impending?

The answer is no.[6] Smith's provider has signed an agreement *not* to balance-bill patients. (*Id.* ¶ 78.) Even setting that aside, the timeline of this litigation suggests that the providers are unlikely to balance-bill. United reported to Smith's provider in April 2021 that United owed them $42,082.12 for Smith's spinal surgery. (*Id.* ¶ 81.) It provided similar reports in January 2021 to Ghanim's provider. (*Id.* ¶¶ 90, 95.) Over the last two years, neither provider has sought to recoup an underpayment from Plaintiffs.[7] As

---

[6] Plaintiffs insist that an "Article III injury arises from the *risk* that the provider *will* balance bill the patient in the future." (Opp. at 26 (emphasis in original) (citing *HCA Health Servs. of Ga., Inc. v. Emps. Health Ins. Co.*, 240 F.3d 982 (11th Cir. 2001)).) Plaintiffs misread *HCA Health*. It involved a provider who sued an insurance company on a patient's behalf. 240 F.3d at 991. Unlike here, the insurer had refused to pay the patient's bill, so the plaintiff brought a Section 1132(a)(1)(B) denial-of-benefits claim. *Id.* at 985. The issue was whether, to have derivative standing, the patient's provider needed to bill the patient for the outstanding balance before suing. *Id.* The Eleventh Circuit answered no, explaining in part that the logic behind derivative standing for provider-assignees is so they will *not* balance-bill patients. *Id.* at 991 & n.19. The patient's injury in fact, which was assigned to his provider, was the insurer's refusal to cover the patient's benefits—not a balance bill. *Id.* at 991. To the extent that Plaintiffs argue that the reasoning in *HCA Health* in 2001 about balance-billing should apply in patient-initiated lawsuits, future injuries in damages actions are not cognizable under *TransUnion*.

[7] When amending their complaint, Plaintiffs deleted an earlier allegation that the "offsets . . . caused Plaintiff and Class members to incur balance bill liability." (*Compare* ECF No. 1 ¶ 114 (making that assertion in the complaint's class-allegations section), *with* Compl. ¶¶ 96–106 (no similar allegation in the amended class-allegations section).)

discussed, Plaintiffs also have not identified any provider who has ever balance-billed any patient for a cross-plan offset, despite alleging that United recouped $405 million in overpayments in 2020 and $599 million in 2019. (*Id.* ¶¶ 3, 63.)

At best, Plaintiffs allege that there is a "heightened risk" that plan participants "will be balance billed by their provider because the provider has not consented to the offset." (*Id.* ¶ 68.) They cite the Notice sent by United to its self-funded clients, which explains that "there is a risk" that patients may be balance-billed by providers or that "the provider or the balance-billed participant may sue the plan for nonpayment." (*Id.*) Plaintiffs also note that "[c]ertain out-of-network provider [sic] have alleged in lawsuits that in the absence of . . . an agreement [to repay an alleged overpayment], an offset amounts to non-payment of currently pending claims." (*Id.* ¶ 69.) None of these general allegations suggest that a balance bill is imminent in this case.

Plaintiffs' remaining allegations are similarly too generalized to establish concrete harm. They make various offhand references to potential litigation over cross-plan offsets. (*See id.* ¶ 40 ("United promises Plans that it 'will assist with any litigation stemming from the Plan's participation in the Bulk Recovery Process'"); *id.* ¶ 41 ("United's August 2021 Notice entices Plan fiduciaries into authorizing its Bulk Recovery Process by . . . misleading them about the litigation risks that accompany such a decision . . . .").) Plaintiffs also allege that their Plans' summary descriptions "warn[] participants that non-Network providers '*may* bill you for any amounts the Plan does not

pay, including amounts that are denied because one of UnitedHealthcare's reimbursement policies does not reimburse (in whole or in part) for the service billed.'" (*Id.* ¶ 56 (emphasis added).) Again, none of these allegations suggest that a balance bill is certainly impending.

The Court's reasoning tracks a recent, unpublished opinion in the Ninth Circuit. *Ryan S. v. UnitedHealth Grp., Inc.*, No. 20-56310, 2022 WL 883743 (9th Cir. Mar. 24, 2022). In *Ryan S.*, the plaintiff challenged cross-plan offsetting. *Id.* at *3. His argument for standing was that the offsets "allegedly left Ryan S. 'responsible' for unpaid bills that United agreed were covered under his plan." *Id.* The Ninth Circuit concluded that such an allegation was "insufficient to establish that [the plaintiff] was harmed by the alleged offsetting" because the plaintiff had "allege[d] no facts that plausibly explain why cross-plan offsetting would cause the bills to fall to him." *Id.* So too here.[8]

Intertwined with Plaintiffs' arguments about risk of harm is a separate assertion that Plaintiffs' injury is akin to a denial of contract benefits promised under the Plans.

---

[8] The Ninth Circuit in *Ryan S.* leaned into standing's traceability requirement. That is a separate basis for lack of standing in this case. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," such as the providers, "standing is not precluded, but it is ordinarily 'substantially more difficult to establish.' *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (citing *Lujan*, 504 U.S. at 562). "To satisfy that burden, the plaintiff must show at least 'that third parties will likely react in predictable ways." *Id.* (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019))., Plaintiffs have not alleged enough facts to show that their providers would react to cross-plan offsetting by balance-billing Plaintiffs. The providers did the opposite.

This argument falls short, too. Plaintiffs rely heavily on the Eighth Circuit's opinion in *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529 (8th Cir. 2020). In *Mitchell*, participants in an employee health plan sued their plan administrator for partially denying their benefits claims. *Id.* at 533. On standing, the court reasoned that "plan participants are injured not only when an underpaid healthcare provider charges them for the balance of a bill; they are also injured when a plan administer fails to pay a healthcare provider in accordance with the terms of their benefits plan." *Id.* at 536. "This follows from the fact that plan participants are contractually entitled to plan benefits." *Id.* The court determined that a denial of benefits to which a plan participant is contractually entitled is a concrete, particularized injury and therefore cognizable. *Id.*[9]

By contrast, here, Plaintiffs cannot plausibly allege that United breached the terms of the Plans. Plaintiffs repeatedly recognize that the Plans permit United to employ cross-plan offsets. (Compl. ¶¶ 10, 47–51, 54.) As Chief Judge Schiltz put it in one of the previous challenges to cross-plan offsetting, "if . . . plans authorize cross-plan offsetting, . . . it will

_____

[9] Plaintiffs cite several out-of-circuit cases for the same proposition: a denial of contractual benefits is a cognizable injury in fact. (Opp. at 23, 26.) Each case is distinguishable on the same basis as *Mitchell*: Plaintiffs' Plans permit cross-plan offsetting, so there was no denial of contractually-guaranteed benefits. *See Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) (concluding that there was an "injury within the meaning of Article III because [the patient] was denied health benefits he was allegedly owed under the plan."); *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 193 (5th Cir. 2015) ("failure to pay also denies the patient the benefit of her bargain"); *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014) (reasoning that patients had a "legal right to seek payment" after an insurer denied benefits claims).

be very difficult for plaintiffs to hold United liable for doing what the plans authorized it to do." *Peterson*, 242 F. Supp. 3d at 850.

### III.    Informational Harm

Plaintiffs' final theory of harm is contained in a footnote. They assert an "informational injury" when United failed to inform them that their benefits payments were being used to reimburse other plans. (Opp. at 28 n.10.) Plaintiffs contend that this failure to inform denied them their right to appeal United's use of cross-plan offsetting under United's review process. (*Id.*)

The Court begins by noting the narrow reach of this injury. Informational harm relates only to Plaintiffs' claim for a violation of Section 1133, United's failure to establish and maintain reasonable claims procedures. (Compl. ¶¶ 132–37.) Section 1133 requires United to "provide adequate notice in writing to any participant . . . whose claim for benefits under the plan has been denied" and "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C. § 1133(1)–(2). For successful claims under Section 1133, the proper remedy is procedural, not substantive, meaning that it does not entitle Plaintiffs to benefits or an award of damages. *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 225 (4th Cir. 1998). For the alleged Section 1133 violation, Plaintiffs seek an order requiring United to comply with ERISA's requirements for providing timely notice and full and fair review of benefits denials. (Compl. ¶ 137.)

"An asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 141 S. Ct. at 2214 (quotation marks and citation omitted). Plaintiffs allege that United's explanations of benefits were misleading because it did not mention the cross-plan offsets. (Compl. ¶¶ 73, 82, 91.) But Plaintiffs have not identified any adverse effects from those failures to disclose. Again, the Plans permit cross-plan offsetting, and neither provider has balance-billed Plaintiffs. Plaintiffs also admit that United notified the providers about the offsets and the providers' appeal options. (*Id.* ¶¶ 84–86, 88, 92–93.) Both providers prosecuted appeals. (ECF No. 45-1 at 83–85 (Smith), 89 (Ghanim).) The Court therefore cannot find any harm to Plaintiffs.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      United's Motion to Dismiss (ECF No. 41) is GRANTED; and

2.      The above-captioned matter is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: May 4, 2023                          BY THE COURT:

                                            s/Nancy E. Brasel
                                            Nancy E. Brasel
                                            United States District Judge